MARSH-BURKE COMPANY, APPELLEE, V. J. H. YOST,
APPELLANT.

FILED JUNE 18, 1915.   No. 18106.

1. **Monopolies**: RESTRAINT OF TRADE: ILLEGAL COMBINATION.  A com-
bination or conspiracy between two or more persons against any
person, firm or corporation to prevent competition in business in
this state, which is carried into effect, is a violation of the pro-
visions of chapter 45, Rev. St. 1913, commonly called the "Jun-
kin Act."

2. ————: LIABILITY.  An overt act in furtherance of an illegal com-
bination to create a monopoly and stifle competition in business,
resulting in injury to a third person, is actionable, and the members
of the combination are liable to the injured person for all dam-
ages proximately flowing from their illegal conduct.

3. **Conspiracy**: PROOF.  A conspiracy need not be established by direct
evidence of the acts charged, but may, and generally must be,
proved by a number of indefinite acts, conditions and circum-
stances, which vary according to the purpose to be accomplished.
If it be proved that defendants, by their acts, pursued the same
object, although by different means, one performing one part and
another another part, with a view to the attainment of the same
object, the jury will be justified in the conclusion that they were
engaged in a conspiracy to effect that object.

4. ————: EVIDENCE: ADMISSIBILITY.  Where an unlawful conspiracy
or combination is established, everything said, written or done by
either of the conspirators in the execution or furtherance of the
common purpose is deemed to have been said, done or written by
every one of them, and may be proved against each and all of
them.

5. **Instructions** examined and found to contain no reversible error.

6. **Conspiracy**: DAMAGES.  Where the business of a coal company,
owning a plant of the estimated value of $20,000, exclusive of real
estate, shown to have been making a profit of $13,000 a year is
destroyed by the unlawful acts of a combination to prevent com-
petition, a judgment for $23,000 damages is not excessive.

7. **Quære.**  The constitutionality of that part of the Junkin Act pro-
viding for a recovery in excess of compensatory damages is *not*
determined.

APPEAL from the district court for Lancaster county: WILLARD E. STEWART, JUDGE. *Affirmed.*

*Hall & Bishop* and *Mahoney & Kennedy,* for appellant.

*E. C. Strode* and *M. V. Beghtol, contra.*

BARNES, J.

The Marsh-Burke Company, a corporation, brought this action against J. H. Yost, Herbert L. Laird, and Henry M. Boyer, under the provisions of article VIII, ch. 45, Rev. St. 1913, entitled "Unlawful Restraint of Trade," commonly called the "Junkin Act," to recover damages which it alleged it had sustained by reason of a conspiracy of the parties above named to drive the plaintiff out of the business of selling coal in the city of Lincoln and parts of the states of Nebraska, Kansas, and South Dakota.

The petition alleged, in substance, that, for nine years next before the commencement of the action, plaintiff had been a corporation engaged in the business of selling coal at retail and wholesale in the city of Lincoln and throughout the states of Nebraska, South Dakota and Kansas; that defendant J. H. Yost, a resident of Lincoln, was engaged in conducting a line of 30 or more lumber and coal yards in various towns in the state of Nebraska; that defendant sells at retail large quantities of coal, and at all times has been engaged in the active management of his said yards; that Herbert L. Laird is the secretary of the Western Coal Dealers' Association, and that Henry M. Boyer is the division sales agent and territorial manager of the McAllester Fuel Company of Oklahoma, and has the exclusive charge of placing agencies for a brand of fuel known by the trade-name of Bernice coal; that plaintiff, since 1904, had the exclusive agency for the sale of Bernice coal in and about the city of Lincoln up to and until the 28th day of October, 1911, and had at all times purchased that brand of coal from the McAllester Fuel Company through the defendant Boyer; that, during the time from 1904 to October 28, 1911, the plaintiff had expended large sums of

money in the employment of solicitors and in advertising said coal and in extending its sale throughout the said city of Lincoln and vicinity, and had built up a large retail trade for the sale of Bernice coal, amounting to over $100,000 a year. In addition to retailing coal in Lincoln, the plaintiff, in April, 1911, and subsequently thereto, was engaged in selling coal direct to consumers outside of the city of Lincoln and throughout South Dakota, Kansas, and Nebraska at wholesale prices and in car-load lots by means of circulars and letters, and its business in said outside territory had increased to an average of from $4,000 to $5,000 a week; that defendant Yost was a large dealer in coal at his yards in Nebraska, and by plaintiff's sales to consumers in car-load lots at wholesale prices the defendant Yost became angry and displeased, and claimed that plaintiff had interfered with his business and profits in his territory and principalities, that plaintiff was violating the prescribed rules and practices of the members of the coal dealers' association, and called upon the plaintiff and sought to induce it to desist from continuing its sales to consumers in car-load lots at wholesale prices; that plaintiff refused to discontinue its said business; that thereupon defendant Yost persuaded and induced defendants Laird and Boyer to enter into a combination against the plaintiff to injure its credit and refuse to sell it any coal, and to ruin its business and put a stop to the plaintiff's competition with defendant Yost in selling coal, and to that end took steps by which Yost induced the defendant Boyer to cancel the agency of the plaintiff for the sale of Bernice coal, and persuaded the defendant Laird to stop other wholesalers of coal doing business in Chicago and at other points from selling coal to plaintiff; that defendants carried out the agreement and combination, and plaintiff was unable to purchase any coal with which to carry on its business, and was thereby driven from business, and its trade was entirely ruined and destroyed; that defendant Yost made statements derogatory to plaintiff's credit, to its damage in the sum of $95,000, for which amount plaintiff prayed judgment.

Summons was personally served on the defendant Yost, but defendants Baird and Boyer, being nonresidents of this state, could not be served, and the trial proceeded against Yost alone.

There was a motion to make the plaintiff's petition more definite and certain, which was sustained in part. The plaintiff complied, and thereupon a demurrer to the petition was filed, which was overruled, and the defendant answered by a general denial. Trial to a jury in the district court for Lancaster county resulted in a verdict for plaintiff for $38,000. On the hearing of the motion for a new trial, plaintiff was required to remit all of the verdict except $23,000. The motion was then overruled, judgment was rendered on the verdict, and the defendant has appealed. The plaintiff has also perfected a cross-appeal.

It is contended by defendant that the evidence does not show any conspiracy in restraint of trade on the part of any of the defendants, and that therefore there was no violation of the Junkin Act. As we view the record, it shows that Yost, Laird and Boyer sought one common end, which was to compel plaintiff to cease the business of selling coal to consumers in car-load lots at wholesale prices in the territory in which Yost was conducting his lumber and coal yards.

The oral testimony and the deposition evidence comprises more than 500 pages, and it is impossible to refer to the whole of it in the space alloted to this opinion. The substance of the evidence is that plaintiff's agency for the sale of Bernice coal was the most valuable one in the whole state. It had extensively advertised its business in the newspapers and by electric signs since 1904, until the Marsh-Burke Company and Bernice coal had become widely known and associated together. A business had been established of such proportions that it was later divided among five other dealers. It was shown that, if plaintiff's agency for that particular brand of coal was canceled, its business would be crippled and its credit impaired, not only because it had not been able to hold the agency, but because the plaintiff's income from its specialty would be

greatly lessened. When Yost discovered that plaintiff was buying coal in car-load lots and selling it to customers at wholesale prices in his so-called territory, he immediately diverted two cars of Bernice coal from his Grand Island shipment to Lincoln and advertised it for sale to consumers at wholesale prices in that city. This immediately brought Boyer and his sales agent, Fitzgerald, to Lincoln to see defendant Yost. In an interview with him at that time the following conversation, in substance, took place, according to the testimony of Mr. Fitzgerald. We went to see Mr. Yost, as we were expected to protect Burke's agency in this city. Yost said Burke was shipping coal into his towns. He did not claim that Burke was shipping Bernice coal, which Boyer furnished him, to those points. We talked to Mr. Yost about Burke shipping coal out into his towns. I had seen Yost's ad in the paper. We were only interested so far as the sale of our own coal was concerned. Mr. Yost was selling Bernice coal in Hastings and Grand Island. So far as I know, Mr. Burke had never consigned a car of Bernice coal out of Lincoln. We did not permit him to do that. We asked Burke not to do so, and he said he would not. We had taken no action in the matter until we came to Lincoln.

The defendant Yost testified that Mr. Boyer called on him about October 20, 1911. His testimony was as follows: "Mr. Fitzgerald and Mr. Boyer came to our office. Q. In the First National Bank building? A. Yes, sir. Q. About what time of day? A. Well, I should judge about 10, 9 to 10 o'clock in the morning. * * * The first thing he said—he says: 'These two cars of Bernice coal that I had ordered of him, for Grand Island, and I diverted them to Lincoln.' I says: 'Yes, sir.' He says: 'What did you do that for? Mr. Burke has the exclusive agency here, and we don't allow anybody, and don't ship any coal in here as long as Burke has got the agency.' * * * I told him that we were in a scrap, and I wanted as much ammunition as I could get to fight to protect my own interests. He gave me a little roasting for doing that, and stayed about 10 or 15 minutes, and then they

went on.   *   *   *   Q.  When you diverted the shipment
of the Bernice coal, you knew the Marsh-Burke Company
had the exclusive agency for the sale of the Bernice coal
in the city of Lincoln?  A.  Yes, sir.   *   *   *   They would
not probably ship it to me direct in Lincoln.   *   *   *
They probably would not permit it."

Mr. Boyer testified: "The Marsh-Burke people had the
agency for our Bernice coal at Lincoln, a very popular
coal, too, and it was possibly thought on that account that
I might have some influence in the matter.  Q.  The McAl-
lester Fuel Company furnished and supplied for the Ne-
braska territory a very large amount of coal, not only in
Lincoln, but throughout the state, didn't they?  A.  We
had a pretty good tonnage in Nebraska.  Q.  So that you
were sort of in the situation of being compelled to take a
hand in that matter, in order to protect your own busi-
ness?  A.  I was forced into it.   *   *   *   Q.  On the one
hand, was the demand from Mr. Yost that you make the
Marsh-Burke Company stop the sale of coal on mail or-
ders, or suffer the displeasure of Mr. Yost, and dealers of
coal out in the state; and, on the other hand, if the Marsh-
Burke Company took offense, you would suffer their dis-
pleasure in the sale of coal in the city of Lincoln through
that agency?   *   *   *   A.  Well, I was placed in the posi-
tion where the best I got was the worst of it.   *   *   *   As
I understood, Mr. Yost's position was that the Marsh-
Burke people were shipping coal to the consumer in towns
at which he was located, and naturally that interfered with
his business in those towns.   *   *   *   He wanted me to see
if I could get them to stop it.   *   *   *   He wanted me to
cancel my agency with them for Bernice coal.   *   *   *
It would seriously embarrass their retail business in
Lincoln.  Q.  And put them out of business, wouldn't it?
A.  I don't know that he said that.  Q.  That was what you
inferred from what he said, that it would break them,
didn't you, and put them out of business?   *   *   *   I knew
that if I continued selling to the Marsh-Burke people in
Lincoln that I would be advertised all over the state of
Nebraska as doing business with a mail order concern, and

as the result of that I knew that the business of the legiti-
mate coal dealers in Lincoln, I mean, in Nebraska, would
be lost to a very large extent to my company. Q. Did
anything that Mr. Yost said call your attention to the fact
that you would be advertised as furnishing coal to a
mail order concern? A. I knew what would happen to
me." The result of this and other conferences between
Boyer and defendant Yost was the canceling of the Bernice
agency held by the Marsh-Burke Company.

It appears that Mr. Laird's assistance was a matter
which could not be handled as easily as the Boyer affair;
that there would be only one way in which he could be
brought into the matter, other than by securing his volun-
tary assent to the scheme, and that would be to make an
association matter out of it, by making it a trade matter
in which, by virtue of Laird's employment as secretary
of the Northwestern Coal Dealers' Association, he would
be compelled to enter into the combination. There seems
to be no direct evidence as to the way in which Mr. Laird
became one of the conspirators, although there seems to
be ample evidence as to his participation in it. It appears
that the trade war in Lincoln was instigated and fathered
by Yost for the purpose of withdrawing the plaintiff from
the mail order business. It would not seem to make much
difference whether Laird conspired for trade reasons, for
personal reasons, for malicious reasons, or for no reasons
at all. The fact remains that he did, in pursuance of his
conferences with Boyer and Yost, cause the members of
the Northwestern Coal Dealers' Association to cease selling
coal to the Marsh-Burke Company. The plaintiff called
upon Mr. Laird at his office in Chicago to protest against
that action. Burke testified that Laird said that, as long
as plaintiff remained in the mail order business, he would
continue to distribute information to dealers, miners,
wholesalers, and producers that plaintiff was in the mail
order business, and that those men who sold the plaintiff
coal could not expect to enjoy the trade of others as long
as they did so. Laird testified that he told Burke what

would happen to him in Lincoln when mention was made of the advertising in trade journals to his discredit. The testimony shows that Laird told the plaintiff that Yost was making a great deal of money; that he was powerful and influential, and that plaintiff could not withstand his opposition; that he (Laird) had a fund of $2,000,000 for the purpose of stopping the mail order business. It seems that Laird's influence was powerful enough to meet the demands made by Mr. Yost—that plaintiff should be made to stop the mail order business. It is apparent that it was enough for Laird to explain his mission when he took up the question with the different coal companies belonging to his association that they were on the list as doing business with the plaintiff. Laird had behind him the whole power of the organization called the Northwestern Coal Dealers' Association, and, at the demand of Yost, he used that power to such an extent that the plaintiff was unable to purchase coal from any member of the association. It appears that interviews were had with the other coal dealers in the city of Lincoln, with a view to induce them to use their influence in stopping the mail order business of the plaintiff. There is also some evidence in the record tending to show that Yost took certain steps to injure the credit of the plaintiff. Several interviews were had between Yost, the other coal dealers in the city of Lincoln, and Laird and Boyer, the result of which was to practically put the plaintiff out of the coal business.

In 5 R. C. L. (Conspiracy) sec. 37, p. 1088, it is said: "Conspiracies need not be established by direct evidence of the acts charged, but may, and generally must be, proved by a number of indefinite acts, conditions and circumstances which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the persons accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. The existence of the agreement or joint assent of the minds need not be proved directly. It may be inferred by the jury from other facts proved. It is not necessary to prove that

the defendants came together and actually agreed in terms to have the unlawful purpose, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make him guilty." *Spies v. People*, 122 Ill. 1, 3 Am. St. Rep. 320, 482; *Commonwealth v. Gillespie*, 7 Serg. & Rawls (Pa.) 469; *Ex parte Rogers*, 10 Tex. App. 655, 38 Am. Rep. 654; *Rex v. Brisac*, 4 East (Eng.) 164; *Martin v. State*, 89 Ala. 115, 18 Am. St. Rep. 91; *Ferguson v. State*, 134 Ala. 63, 92 Am. St. Rep. 17, and note; *Franklin Union v. People*, 220 Ill. 355, 4 L. R. A. n. s. 1001; *Kelley v. People*, 55 N. Y. 565; *People v. Flack*, 125 N. Y. 324, 11 L. R. A. 807; *Gibson v. State*, 89 Ala. 121; *People v. Lawrence*, 143 Cal. 148, 68 L. R. A. 193; *Garland v. State*, 112 Md. 83; *State v. Ryan*, 47 Or. 338.

"While a combination of dealers, containing no elements of an intent to restrain trade for the purpose of greed or profit, or of malice, is not an unlawful conspiracy, yet an overt act in furtherance of an illegal combination to create a monopoly and stifle competition in business, resulting in injury to a third person, is actionable, and the members of the combination are liable to the injured person for all damages proximately flowing from their illegal conduct." 5 R. C. L. (Conspiracy) sec. 44, p. 1095. *Employing Printers Club v. Doctor Blosser Co.*, 122 Ga. 509, 106 Am. St. Rep. 137, 69 L. R. A. 90; *Klingel's Pharmacy v. Sharp & Dohme*, 104 Md. 218, 118 Am. St. Rep. 399, 7 L. R. A. n. s. 976.

We therefore conclude that the evidence was sufficient to warrant the jury in finding that Yost, together with Boyer and Laird, were guilty of a combination in restraint of trade, and its result was injury to the plaintiff in its business as coal dealers.

Section 4045, Rev. St. 1913, provides, among other things: "Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy shall be deemed guilty of a misdemeanor." Section 4046, provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce, within this state, shall be deemed guilty of a misdemeanor." By section 4062 it is provided: "Any person who shall be injured in his business or property by any other person or persons by reason of anything forbidden or declared to be unlawful by this article may sue therefor in any court of record in this state, in the county in which the defendant or defendants reside or are found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained and the costs of suit, including a reasonable attorney's fee."

It seems clear to us that the acts of Yost, performed in conjunction with those of Boyer and Laird, amounted to a violation of the provisions of the Junkin Act, and constituted a restraint of trade and commerce within this state. *Farley v. Peebles*, 50 Neb. 723; *Cleland v. Anderson*, 66 Neb. 252; *State v. Adams Lumber Co.*, 81 Neb. 392.

The Junkin Act declares the public policy of this state toward monopolies and combinations in restraint of trade. The sweeping character of the provisions of the act and the penalties provided for its violation evidence the attitude of the people of the state toward an attempt on the part of one man or any group of men to gain for themselves an advantage in trade or commerce by so manipulating affairs that they may stifle competition or regulate prices; and we are of opinion that for the acts of the defendant plaintiff was entitled to compensatory damages. This brings us to the consideration of the amount of its damages. It must be conceded, as claimed by the defendant, that the measure of damages for the interruption or

destruction of a going concern is the loss of profits proved to a reasonable certainty. The plaintiff was a going concern with a constantly increasing business. Its books, together with a compilation of the same, were introduced in evidence. They showed plaintiff's profits for the years 1907-1911, inclusive, on Bernice coal alone, to be from $539.50, the first year, to $2,502.06, the last year. On other coal plaintiff showed a profit as follows: 1907, $3,539; 1908, $4,361; 1909, $4,141; 1910, $3,819—this without including the odd cents. On plaintiff's mail order business it made a profit in 1911 of $10,800, and a total profit in the year 1911 on all coal sold of $13,995.72.

At the time when the defendant made the attack on plaintiff's business it owned 12 wagons, 22 horses, and a suitable equipment for the delivery of coal to its customers in Lincoln. It owned yards near the tracks of the Rock Island railroad, and had an office equipped to do a general coal business. The value of its plant was shown to be $20,000, exclusive of real estate. Its business had been skilfully managed by A. F. Burke, and had steadily increased from year to year. The evidence showed that, in less than a year after defendants commenced the attack, the business was completely ruined, and the company was unable to purchase coal in any considerable quantities from any wholesale dealers. This was the penalty exacted by defendant Yost, with the aid of Boyer and Laird, for the competition which plaintiff created in the territory which Yost claimed as his own.

The jury returned a verdict in plaintiff's favor for $38,000, on which the court rendered judgment. On a motion for a new trial plaintiff's recovery was reduced to $23,000, and for that amount the court finally rendered a judgment against the defendant Yost. A careful examination of the evidence has satisfied us that the judgment is not excessive. The attack on plaintiff's business made by Yost, Boyer and Laird having been sufficiently shown, defendant's objections to the evidence were without merit. The instructions given by the court and those tendered by the defendant, which were adopted and given in substance,

show that the case was properly submitted to the jury, and defendant's exceptions on the question of instructions were properly overruled.

By its cross-appeal plaintiff contends that the district court erred in refusing to render a judgment in its favor for triple damages. It must be observed that the plaintiff, by its petition, prayed only for compensatory damages. No claim was made in any of the pleadings or proceedings at any time for triple damages, as provided by section 4062 of the Junkin Act, until after the trial court had rendered its judgment on the verdict. The case appears to have been tried and submitted to the jury on the theory that plaintiff should recover only compensation for the injuries it had sustained by defendant's unlawful acts. It would also seem that plaintiff, by filing its remittitur of $15,000, and asking the court to render a judgment for $23,000, was not thereafter in a position to require the court to triple the amount of the judgment. We therefore consider that we are not required to pass on that question, and we decline, in this case, to determine the validity or constitutionality of that provision of the statutes.

As we view the record, it contains no reversible error, and the judgment of the district court is

AFFIRMED.

HAMER, J., not sitting.

SEDGWICK, J., dissenting.

This is a very interesting case and very important, not only in the amount involved, but in the novel questions presented. The evidence shows that there are two classes of dealers in coal and lumber. Some dealers establish a yard and office in a town, keep a stock of coal, pay taxes on their property, and sell the coal out to consumers at retail. The other class of dealers do what is commonly called a mail order business. They maintain no yards and do not keep a stock of coal, but take orders, and then fill those orders by buying and having the coal shipped directly to their patrons. There is rivalry and hostility between these two classes of dealers, so much so that mine-owners who

Marsh-Burke Co. v. Yost.

sell to mail order houses are not able to sell to what are called the regular dealers. The evidence shows that the plaintiff had coal yards in Lincoln and sold here at retail prices; those prices being sufficient to pay local expenses, taxes, insurance, and presumably a reasonable profit. The plaintiff also began doing a mail order business in the towns where the defendant had yards and was selling at retail. The defendant objected to this and tried to stop it. Was that in itself wrong? This is an important question, because it is common, as we all know, for regular dealers in all lines to object to mail order business and to try to persuade their customers not to deal with mail order houses. Are they violating the law when they do so? This question is not answered by the opinion. The defendant, in retaliation, began doing a mail order business in Lincoln. Was that unlawful? Of course, if it was unlawful for the defendant to do a mail order business in Lincoln, it was unlawful for the plaintiff to do a mail order business in the towns where the defendant had yards; and therefore if the defendant was wrong in starting a mail order business in Lincoln, and it would injure the plaintiff by interfering with its mail order business, that is, if it was only done to stop the plaintiff from carrying on its mail order business, could the plaintiff complain and recover damages from the defendant because the defendant was doing just what the plaintiff had before started to do?

The evidence shows that there was an association of coal dealers. The defendant, it appears, had belonged to this association, but did not at the times complained of in this case. One of the functions of this association is to keep the coal dealers posted as to what is going on. The mine-owners cannot sell to the mail order men and the regular dealers at the same time, because the regular dealers will not buy of one who is selling to a mail order man. The association informs the mine-owners who are mail order men and who are regular dealers. The opinion does not say whether this is wrong; but as the defendant was not a member of the association at the time, and there is no evi-

dence that he participated in notifying the mine-owners as to who were mail order men, I suppose it makes no difference in this case whether the association was doing wrong or not. When the defendant commenced in retaliation doing a mail order business in Lincoln, it created a great furor among the dealers here. They notified their association, and they had meetings and sent out and called the defendant in to one of their meetings and questioned him, and he informed them he was doing it in retaliation; that he had the same right to do a mail order business in Lincoln that the plaintiff had to do the same kind of business in towns where his yards were located. Of course, the defendant knew that this would force the dealers here and the association to take the matter up with the plaintiff, and the defendant did it for the purpose of stopping the plaintiff from doing a mail order business in towns where his yards were located; that is, by introducing the mail order business into Lincoln and other places, he would start up such a disturbance that the parties interested would labor with the plaintiff and probably stop it from doing a mail order business in towns where the defendant's yards were located. Was that a conspiracy? Was the defendant wrong in so doing? The opinion does not answer this question. Does the evidence show directly or by circumstance that the defendant agreed with anybody to do any specific act or thing that would compel or induce the plaintiff to stop its mail order business? If the defendant did so agree with anybody, would that be a conspiracy, within the meaning of the law? The opinion does not answer this question either.

There does not seem to be any evidence that any one objected to plaintiff's retail business in Lincoln. No objection was made against plaintiff as a "regular dealer." It was plaintiff's mail order business that made the trouble. It seems that, as business was carried on in this state, one could not carry on a "regular" coal business, that is, maintain yards and sell at retail at such price as would warrant the use of the necessary capital, the payment of taxes, and those calls for local improvements that business

men must respond to in the towns where they live and their business is located, and at the same time do a mail order business in other towns of the state. The mine-owners who wanted the trade of the regular dealers could not sell to mail order men. If they did, they would lose their regular customers. While plaintiff confined its mail order business to towns in which the defendant maintained yards, no one but defendant would take notice of the fact. It was only necessary that the association should know that plaintiff was a mail order concern and was doing that sort of business in some towns, while in others it was professing to be a regular dealer and was selling at retail prices which would warrant the maintaining of yards for that purpose. As soon as this knowledge came to the association, the information was passed along to mine-owners who were selling to plaintiff, and those mine-owners who were selling to plaintiff, especially Mr. Boyer, soon let plaintiff know that the patronage of the regular dealers was preferred, and the mail order men could not buy from them. Is there evidence that Yost did more than to take the most effective means to make it known that plaintiff, while maintaining yards as a regular dealer, was becoming a mail order concern also?

The opinion says: "As we view the record, it shows that Yost, Laird and Boyer sought one common end, which was to compel plaintiff to cease the business of selling coal to consumers in car-load lots at wholesale prices in the territory in which Yost was conducting his lumber and coal yards." The opinion assumes that this would be a violation of the Junkin Act, without directly saying so. "Sought one common end" is a mild way of stating a conspiracy. If the "common end" was unlawful, it is very important to make that clear in a manner that we can stand by and enforce hereafter. The thing is so very common in all parts of the state that there are few regular retail dealers in any line of business that are not directly interested in this view of the law. Has a regular retail dealer a right to try to stop a mail order business in the town where his property and interests are located? It

may be unlawful, but there is at present a difference of opinion on the subject throughout the state, and if that is the gist of the claim for damages, as it seems from this opinion to be, we ought to make our position clear and unequivocal. Does the evidence quoted in the opinion prove that Yost did some unlawful act to prevent plaintiff's mail order business? What unlawful act did he do? The opinion does not specify. Boyer testified that Yost "wanted me to cancel my agency with them for Bernice coal." No doubt, under the circumstances, Yost wanted him to do that, but how did Boyer find out that Yost wanted him to cancel plaintiff's contract? Yost did not ask him to cancel it. Boyer knew from existing conditions that every regular retail dealer in the state would want him to cancel plaintiff's contract if plaintiff persisted in the mail order business. The evidence quoted in the opinion, instead of proving that Yost asked Boyer to cancel plaintiff's contract, proves the contrary. "I knew that if I continued selling to the Marsh-Burke people in Lincoln that I would be advertised all over the state of Nebraska as doing business with a mail order concern, and as the result of that I knew that the business of the legitimate coal dealers in Lincoln, I mean, in Nebraska, would be lost to a very large extent to my company. Q. Did anything that Mr. Yost said call your attention to the fact that you would be advertised as furnishing coal to a mail order concern? A. I knew what would happen to me." The fact that the association knew that he was selling to a mail order house would be enough to ruin his business in the state. Yost's act in beginning a mail order business in Lincoln was enough to inform the association what was going on, and this seems to be all that the evidence quoted in the opinion shows that Yost did.

It seems to me that the importance of the matter demands that the opinion should state specifically what provisions of the Junkin Act were violated, what unlawful means were used, what facts evidence a conspiracy, and the evidence that proves that Yost entered into the conspiracy and did unlawful things.