PICCOLO-LYNAM DRUG COMPANY, A CORPORATION, APPELLEE, v. THE OMAHA NATIONAL BANK, TRUSTEE OF AND FOR CENTER PLAZA, ET AL., APPELLANTS.

241 N. W. 2d 107

Filed April 14, 1976. No. 40295.

Gerald P. Laughlin and Michael G. Lessmann of Baird, Holm, McEachen, Pedersen, Hamann & Haggart, and Tyler B. Gaines of Gaines, Spittler, Otis, Mullen & Carta, for appellants.

R. David Garber of Garber & Batt, and Marks, Clare, Hopkins & Rauth, for appellee.

Heard before SPENCER, BOSLAUGH, and McCOWN, JJ., and COLWELL and KELLY, District Judges.

SPENCER, J.

Plaintiff, Piccolo-Lynam Drug Company, brought this action for damages for breach of an exclusive covenant in its lease. The case was divided into two segments for trial. The first half of the trial involved the issue of liability, and was submitted to the jury on three specific questions in the form of special interrogatories. The jury answered each of the interrogatories in the affirmative, and the second half of the trial was held. It involved only the issue of the amount of damages.

This appeal involves only the three issues tried in the first segment of the case. They are: (1) Whether the provisions of the lease were intended to give plaintiff exclusivity of 2½ acres or 20 acres; (2) whether the defendants conspired to violate the provisions of plaintiff's lease; and (3) whether plaintiff is the real party in interest. We affirm.

In 1960, a 20-acre tract on the southwest corner of 84th Street and West Center Road in Omaha was transferred from Marshall Nurseries, Inc., to Evergreen Company, Inc., a wholly owned subsidiary of the defendant, American Community Stores Corporation. The tract was unimproved. American, owner-operator of the Hinky Dinky grocery chain, and hereinafter referred to as Hinky Dinky or American, decided to build a grocery store on the northeast corner of the tract. Through a declaration of trust, dated February 21, 1964, and a corporate warranty deed from Evergreen Company,

Inc., dated February 13, 1964, the portion of the northeast corner on which the store and its parking lot were to be situated was transferred to the defendant, The Omaha National Bank, in trust. The beneficiary of the trust was Jule M. Newman, at that time the chairman of the board of American Community Stores Corporation.

Prior to August 1964, Louis J. Piccolo, a former stockholder, director, and officer of the plaintiff, who operated a drugstore business on the north side of West Center Road across from the 20-acre tract, determined that it was desirable to relocate his store. He contacted Hinky Dinky about leasing space in a new building being erected east of the Hinky Dinky store building. He and his attorney, William J. Lindsay, worked out the terms of a lease with Dean Hascall, an attorney employed by Hinky Dinky to manage its real estate and to negotiate for space in its buildings.

Lindsay testified that during his negotiations in August of 1964, his independent knowledge of Hinky Dinky's ownership of the 20-acre tract was confirmed by Hascall when Hascall referred to future commercial development on the unimproved land. At Lindsay's insistence, as attorney for Piccolo, provisions for exclusivity of Piccolo's drugstore operation on the property were discussed and eventually included in the lease.

At the time of the execution of the lease the title to the land on which the Hinky Dinky store stood with the parking lot had been conveyed to The Omaha National Bank, trustee. The balance of the 20-acre tract, including the area on which the building in which Piccolo was interested was being built, was in Evergreen Company, Inc., a completely owned subsidiary of American. At that time the 20-acre tract was occupied only by a Hinky Dinky store and the customer parking area.

Lindsay testified that Hascall mentioned during the negotiations that he did not know who the landlord in the lease would be but that it probably would be in a trust. The negotiations for the lease were concluded

with the understanding that a lease for a portion of the new space would be forwarded to Lindsay by Hascall. A lease was so forwarded in March of 1965. It was executed by Piccolo. At the time of its execution, lessor's name did not appear on the lease. The lease was then returned to Hascall.

Hascall testified that because of an oversight, the land on which the plaintiff's store was located had not been conveyed to a trust prior to the plaintiff's execution of the lease. For this reason, Evergreen Company conveyed the remainder of the northeast corner of the 20-acre tract to the bank as trustee by deed dated June 29, 1965. Thereafter, the lease was executed by the bank and a copy forwarded to the plaintiff. Lindsay testified that he first learned that the bank, as trustee, was named as lessor when he received the executed lease about July 7, 1965.

The lease contained the following pertinent clauses: "2. PREMISES: That in consideration of the rents and covenants to be paid and performed by the Lessee, the Lessor hereby demises and leases to the Lessee the building or part thereof described as follows:

"A room measuring approximately 30 x 126 feet and containing approximately 3,780 square feet situated in Omaha, Douglas County, Nebraska, as shown on the attached plot plan marked Exhibit 'B', together with the right of ingress and egress and with all rights, easements and appurtenances thereunto belonging and usually had and enjoyed therewith, and upon all the terms and conditions hereinafter set out. * * *

"5. USE: The Lessee shall have the right to the exclusive operation of a retail drugstore upon the location hereinabove described and the Lessee agrees that he will conduct such drugstore similar to the one which he has operated the past seven years in the vicinity of the above property. The Lessee further agrees that he will not sell groceries, meat, produce and will not change the operation of his drugstore so as to be in competition

with the sale of groceries and meats and produce as being presently sold by the Hinky Dinky Store on the same premises. * * *

"22. PERCENTAGE RENTAL * * *

"The Lessor agrees that it will not lease any other portion of property owned by it to anyone engaged in the same or similar business as the Lessee."

On September 1, 1968, the stock in plaintiff corporation was sold to Allen Kubat who took over direction and control of the business. Both Kubat and Piccolo testified that all dealings concerning the drugstore property were handled by Hinky Dinky employees. The bank's trust officer testified that the bank did nothing other than to make certain that taxes on the property were paid and to make occasional remittances to the beneficiary, Jule M. Newman. Hinky Dinky collected the rent, saw to it that the services required under the lease were provided, and handled all complaints by the tenants.

In late 1968 and early 1969, representatives of L. J. Newman, who is Jule M. Newman's son and who had been involved with American's business, made arrangements to lease the remainder of the 20-acre tract (approximately 17 acres) to an Indiana real estate developer. A 55-year lease, dated September 1, 1968, was signed in January of 1969, by Omaha Development, Inc., the Indiana concern, and in February 1969, by L. J. Newman and his wife. At the time, title to the remaining 17 acres was still held by Evergreen Company. Subsequently, on April 3, 1969, Evergreen conveyed this tract to American by warranty deed. The next day, American deeded the tract to L. J. Newman in a transaction designed to allow L. J. Newman to exchange his stock in American for the land. At this time, L. J. Newman's father was chairman of the board and his brother president of American. This transaction was deemed desirable since L. J. Newman, a California resi-

dent, no longer desired to be involved in the American operation.

Earlier, in March 1969, while title was still in Evergreen, L. J. Newman, as owner of the 17-acre tract, and the bank, as trustee, had signed a document styled "Easement and Agreement," under which the owners of both tracts agreed to cross-easements between the properties. This "Easement and Agreement" was amended later to authorize development of a "community unified commercial shopping center under a general plan or scheme" on the 20-acre tract. These documents were negotiated by Hinky Dinky and presented to the bank for signature.

On May 1, 1969, Omaha Development, the ground lessee of the 17-acres, assigned its lease to Douglas Development Company, an Indiana limited partnership. The Walgreen lease which gave rise to this cause of action was made by Douglas Development in November 1969. Under that lease, Walgreen obtained space in a building to be constructed as part of a new shopping center on the 17-acre tract.

In April 1969, Kubat filed articles of incorporation for Allen's Pharmacy. On March 27, 1970, the plaintiff corporation made a written assignment of its lease to Allen's Pharmacy to be effective May 1, 1970. On July 2, the plaintiff made a bill of sale of all its assets to Allen's Pharmacy, Inc. Plaintiff then requested approval of an assignment of its lease to the new corporation. Lessor bank, through the attorneys representing the defendants herein, refused to accept the assignment or to release the plaintiff.

When Kubat learned that Walgreen contemplated opening a drugstore on the 17-acre tract, he contacted Hinky Dinky to protest. He was informed that the lease was to be made and Walgreen would operate its store regardless of his protest. This action was filed March 11, 1970.

Walgreen opened for business on June 30, 1970. Its

store was approximately 300 feet from the plaintiff's store. The drugstore business operated in the plaintiff's establishment closed in August 1971, as a result of the competition of the Walgreen store.

The primary question herein is the one covered by the first interrogatory. Was the evidence sufficient to prove Piccolo-Lynam Drug Company had been given an exclusive right to operate a drugstore on the entire 20-acre tract? The jury answered this question in the affirmative. We find there is evidence in the record from which the jury could reach this conclusion.

As we stated in Torstenson v. Melcher (1976), *ante* p. 764, 241 N. W. 2d 103: "In determining the sufficiency of the evidence to sustain a judgment, every controverted fact must be resolved in favor of the successful party, and he must have the benefit of every inference that can reasonably be drawn from the evidence."

The standard of review is settled: "The verdict of a jury based upon conflicting evidence will not be set aside on appeal unless it is clearly wrong." Cook v. Nordahl (1974), 191 Neb. 424, 215 N. W. 2d 643.

American argues plaintiff could not have had an exclusive use covenant over the 17 acres because the bank never had title to more than 2½ acres. Actually, the bank did not have any title to the property covered in the lease at the time it was negotiated and signed by the plaintiff. At that time, while the area embraced by the Hinky Dinky store was in the trust, the balance of the 20 acres was owned by American through its subsidiary, Evergreen.

Dean Hascall was employed solely by Hinky Dinky. He had no connection with The Omaha National Bank, trustee. The representatives of the plaintiff were insisting on exclusivity for its drugstore. Plaintiff's drugstore was to embrace approximately one-fourth of the space in the new building on the 2½ acres which otherwise was occupied solely by the Hinky Dinky store

and the parking lot. It seems only logical that the plaintiff, knowing Hinky Dinky owned the balance of the tract, in talking about exclusivity was concerned about more of the area than the remaining office space in the small building it was to occupy.

The name of The Omaha National Bank was never disclosed to any representative of the plaintiff at any time during the negotiations. As noted, the property was not even titled in The Omaha National Bank at that time. The transfer to the trustee was made subsequent to the negotiations, and subsequent to the time that the lease was executed on behalf of the plaintiff. The name of the grantor was not in the lease at the time it was executed by the plaintiff. The evidence is also undisputed that no plot plan marked "Exhibit B," as mentioned in the lease, was ever attached to the lease.

The representatives of the plaintiff had every reason to believe they were dealing solely with Hinky Dinky which owned this property and the remaining 17 acres through its wholly owned subsidiary, Evergreen Company. It was evident the remaining property in the 20-acre tract was suitable for commercial purposes and that would undoubtedly be its ultimate use.

The fact that the Evergreen Company conveyed the property covered by the lease to a trust for the benefit of Jule M. Newman, the chairman of the board of American, should not deprive plaintiff of the benefit of its lease. Control and management of the property was exercised by Hinky Dinky at all times thereafter.

On the issue of conspiracy, the jury additionally had the following facts: Hascall testified he assumed the portion of the tract on which the new building which plaintiff leased had been conveyed by deed to the defendant bank. When he discovered it had not been deeded to the bank, without making any disclosure to any representative of the plaintiff he prepared the deed of June 29, 1965. He had the bank execute the lease as lessor and forwarded it to Lindsay. It was received by

Lindsay on or about July 7, 1965. The deed of June 29, 1965, was not recorded until July 9, 1965. It is to be noted that the deed of June 29 was made to the bank by Evergreen Company, the wholly owned subsidiary of American. It was not made by the beneficiary of the trust, Jule M. Newman, the chairman of the board of American. Hinky Dinky presented no evidence as to any earlier sale or trade of that real estate to Newman or any consideration for the conveyance.

Richard Hiller, the bank trust officer, testified he had never made an inspection of the 2½-acre portion of the tract for which the bank held legal title on behalf of the trust. He had no contact with any representative of the plaintiff. The trustee did nothing other than make certain that taxes on the property were paid and make occasional remittances to the beneficiary of the trust. The documents through which cross-easements were granted between the respective legal owners of the 2½-acre portion and the 17-acre portion of the tract were negotiated by Hinky Dinky, and thereafter presented to the bank for signature.

In connection with the execution of these cross-easements, the trustee relied solely upon what its representatives were told by representatives of Hinky Dinky. The trustee made no independent investigation to determine the necessity of the cross-easement encumbering the bank's 2½-acre portion of the entire tract. It did not have any contact with the plaintiff either before or after the execution of the agreement. In essence, the record indicates that the trustee did whatever it was asked to do, based upon assurance of propriety from Hinky Dinky. It exercised no independence of judgment or action. It exercised none of the caution one would expect a legal title owner of real estate to exercise if it were more than a financing agent for American and Jule M. Newman.

Harlan Noddle, the director of real estate of Hinky Dinky, testified he had knowledge of the existence of the

exclusivity provision in the lease. He had had various telephone conversations with representatives of the plaintiff. He knew of no exclusivity covenants in other tenant leases negotiated with Hinky Dinky. Noddle testified that although Hinky Dinky was not a party to any of the cross-easement agreements, provision was made acknowledging Hinky Dinky's exclusivity in the tract to prohibit leasing of space to a competitive grocery supermarket.

Noddle was directly involved in the negotiations of the cross-easement agreements on behalf of the defendant bank as well as the owners of the 17-acre tract. He also represented the special interests of Hinky Dinky in both the bank's and Newman's respectively owned portions of the entire tract. The conveyances and cross-easement agreements ultimately enabled the commercial developer of the 17-acre Newman-owned portion of that tract to successfully negotiate a lease with the Walgreen Company. This permitted Walgreen to open a drugstore in direct competition with the plaintiff and within 300 feet of the plaintiff's establishment. The cross-easement agreement states as a purpose for the agreement that the entire 20-acre tract development should be a unified and uniform development.

When the plaintiff's representatives learned of the possibility of Walgreen leasing space on the 17-acre tract, they visited with Noddle about the exclusivity provision. They were advised that space in the 17-acre tract was going to be leased to Walgreen in spite of the provision in plaintiff's lease.

Allen Amil Kubat, who bought the stock in the plaintiff corporation, assumed the office of president in September of 1968. Sometime in 1967 or early 1968, he observed a Hinky Dinky sign on the 17-acre tract. It stated that space was available in a developing shopping center, and gave a Hinky Dinky telephone number. Exhibit 23 is a photograph of that sign. It reads:

"Hinky Dinky
15 acres
SHOPPING CENTER
Now being developed on this
site — space available for lease
CALL    Dean Hascall
341-3688"

All the rent checks in evidence show they were deposited to the account of Center Plaza in The Omaha National Bank. All but two of the checks are made payable to Center Plaza. Of those two, one is made payable to Omaha National Bank, Trustee, Center Plaza. The other, for 3 months' rent, dated 12/31/1969, is payable to Hinky Dinky. All the checks were delivered to American. Center Plaza was the name given to the 20-acre development.

In Marsh-Burke Co. v. Yost (1915), 98 Neb. 523, 153 N. W. 573, we held: "A conspiracy need not be established by direct evidence of the acts charged, but may, and generally must be, proved by a number of indefinite acts, conditions and circumstances, which vary according to the purpose to be accomplished. If it be proved that defendants, by their acts, pursued the same object, although by different means, one performing one part and another another part, with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object."

On the record, the jury could infer that plaintiff's representatives at all times believed they were dealing with Hinky Dinky on a partial development of a 20-acre tract and entered into the lease on the strength of the exclusivity covenant. It could have inferred that from the inception of the transaction the conveyance to the bank was an attempt to avoid the effect of plaintiff's exclusivity agreement. It might further have inferred that this action was a conspiracy on the part of the defendants; also, that it continued through the deeding of

the 17-acre tract and the execution of the cross-easement agreements leading to the development of the tract. Further, it allowed the developer to lease space for a Walgreen store within 300 feet of plaintiff's drugstore, thus violating plaintiff's exclusivity contract. It could have inferred the bank was well aware of the exclusivity covenant and should have protected plaintiff in the cross-easement agreements as it did Hinky Dinky.

On the third issue, the real party in interest, the evidence in the record clearly and unequivocally indicates that the defendants refused to accept an assignment of plaintiff's lease to a related corporation, Allen's Pharmacy, Inc. Consequently, plaintiff corporation, even if owned by Allen's Pharmacy, had no alternative but to continue as lessee and to pursue this action in its own name. It should be patent that the defendants could not refuse to accept an assignment of a lease and then in an action brought on the lease insist that the named lessee with whom they insisted on dealing was not the real party in interest. On this record, the finding of the jury that the plaintiff was the real party in interest is fully sustained by the record.

The judgment of the District Court is affirmed.

AFFIRMED.