## LIND NELSON v. COLONEL J. HIATT.

### FILED NOVEMBER 23, 1893. No. 5224.

Good-Will: SALE: BREACH OF CONTRACT: DAMAGES. A party
sold his business and the good-will of the same to another, and
agreed not to do a general business at that point. He violated
his agreement, and engaged in business at the place named.
The matter was then submitted to arbitration, and an award
made assessing damages and restraining the vendor from again
doing business at that place. Afterwards he carried on business
at the place named. *Held*, That the purchaser was entitled to
compensation for a violation of the agreement, and the damages
could not be considered excessive.

ERROR from the district court of Gage county. Tried
below before BROADY, J.

*Griggs, Rinaker & Bibb,* for plaintiff in error, cited:
*Holmes v. Boydston,* 1 Neb., 346; *French v. Ramge,* 2
Neb., 254; *Sycamore Co. v. Sturm,* 13 Neb., 215; *Bridges
v. Lanham,* 14 Neb., 369; *Denver, T. & G. R. Co. v.
Hutchins,* 31 Neb., 572.

*Hardy & Wasson, contra.*

MAXWELL, C. J.

This is an action for a breach of the following agreement:

"This agreement, entered into this 22d day of August,
1889, by and between Lind Nelson and C. J. Hiatt, wit-
nesseth: That the said Lind Nelson, for and in considera-
tion of the covenants to be performed by C. J. Hiatt, do
promise and agree not to buy hogs or cattle to ship from
this place of Odell, Gage county, Nebraska, except said
Lind Nelson has a part of car load of cattle to ship, then
said Nelson has the privilege to buy to fill said car and
ship the same. This agreement to be in force so long as

C. J. Hiatt is in the business of buying and shipping from Odell, and no longer.                    LIND NELSON.

"C. J. HIATT.

"Witness: MAT BROOKS."

The price paid by Hiatt seems to have been $1,000. Lind seems to have continued to purchase stock in violation of the agreement, and the parties submitted the matter to arbitration, the award being as follows:

"BEATRICE, NEB., June 11, 1890.

"We, the undersigned arbitrators in the case of *C. J. Hiatt v. Lind Nelson*, find:

"1. That above named defendant shall pay all court costs and the costs of this arbitration.

"2. That said defendant Lind Nelson shall pay the sum of $125 to the plaintiff C. J. Hiatt, as damages in full to date.

"3. That the defendant Lind Nelson shall hereafter abstain from engaging, either directly or indirectly, in the business of buying and shipping hogs or cattle at the village of Odell, Gage county, Nebraska, in accordance with the articles of agreement entered into on the 22d day of August, 1889, by and between above named plaintiff and defendant.

"In witness whereof, we have hereunto set our hands this 11th day of June, 1890.      L. E. WALKER,

"G. L. COLE,

"E. C. SALISBURY,

"*Arbitrators.*"

After this award was made the plaintiff continued to purchase stock in violation of his agreement, and this action was brought to recover for the damages.

In his answer to the petition the defendant below, Lind Nelson, alleges:

"1. That he admits that on August 22d, 1889, he entered into the written agreement with plaintiff set forth in plaintiff's petition as Exhibit 'A.'

"2. That there was no consideration for the said contract; that the property sold by defendant to plaintiff was well worth the sum paid by plaintiff to defendant at said time.

"3. That prior to and ever since the 11th day of June, 1890, the said plaintiff quit and ceased the business of buying and shipping of cattle and hogs from Odell, Gage county, Nebraska.

"4. That he denies each and every allegation in the first cause of action in said plaintiff's petition contained not herein expressly admitted or denied."

The second cause of action was withdrawn from the jury and need not be considered.

The principal errors relied upon are that the damages are excessive, and that the verdict is not sustained by sufficient evidence. These are considered together in the plaintiff in error's brief and will be so considered here.

Hiatt testified as a witness in his own behalf as follows:

Q. Are you the party that made the contract, Exhibit A, attached to the petition, with Mr. Nelson?

A. Yes, sir.

Q. You may now state what you purchased of Mr. Nelson under that contract, and what you paid for it.

A. I purchased his shipping yard and scales, and there was an old corn-crib in the yard and a shanty for a kind of office he had there, he had been using it for a hog pen part of the time, and the good-will of the business.

Q. What did he say to you in regard to the value of his business?

A. He said his business was worth $100 a month. He said the reason he wanted to sell——.

Q. (By Mr. Bibb.) Was there any written contract of sale between you—any written bill of sale?

A. Yes, he gave me a deed to the land.

Q. This contract was in writing, then?

A. Yes.

Q. How much did you pay him, by the way?

A. I paid him the sum of $1,000.

Q. When did you take possession of the property?

A. Some time in August, 1889.

Q. How long after you made the contract?

A. The next day.

Q. Then what did you do there?

A. Well, I was living on the farm at the time.

Q. You may state whether or not you continued in business there up to the time you commenced the first action in the case of *Hiatt v. Nelson.* What business were you engaged in?

A. I was shipping from Odell.

Q. Shipping what?

A. Cattle and hogs.

Q. How did you get them to ship?

A. I bought them of farmers.

Q. Now, skip down to the 11th of June, 1890. What occurred about the 11th of June, 1890, after the commencement of the suit?

A. I got word that our suit was set for a certain day, and Nelson came to me and wanted to settle before we came up. I asked him how he wanted to settle, and he said he wanted to leave it to arbitrators; and I asked him who he wanted to pick for as arbitrators, and he said we would take three men out of the Masonic lodge at Odell. I objected to it. I told him I didn't want to mix any of our members up in the business, but was willing to go to Beatrice and pick men within the lodge there, and we agreed to it and came.

Q. What was done after you got here?

A. Well, we chose arbitrators.

Q. Do you know who they were?

A. L. E. Walker, G. L. Cole, and a Mr. Steele—I forgot his first name. Any way, he couldn't serve, and we chose Mr. Salisbury in his place.

35

Q. Was there any written obligation made before this was arbitrated?

A. Yes.

Q. On the 11th day of June, 1890, what business were you engaged in?

A. Engaged in the shipping business,—live stock, from Odell, Nebraska.

Q. How long had you been engaged in the business prior to that time at that place?

A. Since August.

Q. At the time of making that contract?

A. Yes, sir.

Q. State what year it was that you made the contract to commence business.

A. In the year 1889.

Q. And the 11th of June you were engaged in the same business up to January first?

A. Yes.

Q. Go on and tell the court how you were engaged in business, and what you were doing from that time up to January, 1891.

A. I was shipping hogs and cattle from Odell to market.

Q. Where did you get them to ship?

A. I bought them from farmers in that county.

Q. State to what extent you were engaged in it.

A. I was engaged in it all the while. I put in all my time to that business, and have ever since I bought the business.

Q. What was defendant Nelson doing from the 11th of June, 1890, up to the 17th of January, 1891?

A. He was engaged in the same kind of business.

Q. Where?

A. At Odell.

Q. In this county?

A. Yes.

Q. Where did he get his stock to ship?

A. Well, he got part of them from the same men that I got mine of, and different farmers around.

Q. How did he get them of the farmers?

A. I suppose he bought them.

Q. Now, he during this time was carrying on business there in competition with you?

A. Yes, he was.

Q. Tell how that affected you in regard to your buying. Go on and tell the jury.

A. Whenever he got a chance to overbid me on anything he would go and buy it regardless of the market. If I had bid on a bunch of stock all the market would afford, if the same men gave him a chance to bid he would go and buy it, to keep me from buying it, regardless of the market.

Q. State whether or not he compelled you to bid for stock more than it was worth. How did that affect your buying?

A. It caused me to have to pay more for stock than I could afford to and ship them to get my money back. It caused me to lose money in buying.

Q. How has his buying there in competition with you affected your business and trade?

A. Well, it has taken off the profit of the business. He caused me to ship a good many less stock than I would if he hadn't been in the business.

Q. How has what you had to pay for stock there,—has it been increased?

Q. You may state how in particular circumstances or cases that you know of, where he has bought stock from under you and caused you to bid more for it than it was worth?

A. There has been quite a number of acses, and I believe it was the 5th of November I went out and bought a car load of hogs, and he came along behind me and went to every man I bought of and offered them ten cents more a hundred than I bid for them, and told the men they were

worth that to ship. When they came in with the hogs they wanted me to give the rise on the market, and I told them I bid all I could afford to pay and ship them, and I showed them the market, and I don't think there was a man but was satisfied to let me have the hogs, except one man, Payne, who told me if he could not get any more when he brought them in he would let me have them. Nelson paid him sixty cents, and I bid $3.50. That was the only load of hogs he got out of the car load I bought.

Q. Where did he keep himself; where did he stay during this time?

A. He staid on the street and riding around the country.

Q. What was he doing there?

A. Bidding on stock and buying and shipping.

Q. To what extent did he buy and ship?

A. I don't know just how many car loads he bought and shipped. He was shipping right along,—he and Raney. He had a partner, and one would go one way and the other the other.

Q. How has it affected the business there at Odell as regards the business being profitable or not?

A. Well it has affected it so there has been no money in it to me.

Q. Now you are acquainted with the extent of that business at Odell, buying and shipping hogs that come in at that point, are you?

A. Yes, sir.

Q. You say at the time you made the contract and bought him out he told you how much the business was worth per month?

A. He told me there was about $100 a month in the business.

Q. How much have you been damaged for the seven months from June 11, 1890, to January 17, 1891, by reason of his buying and shipping hogs at Odell in competition with you?

Q. How much under ordinary circumstances, were not Mr. Nelson purchasing and shipping hogs and cattle from Odell, would the business have been worth from that particular month, from the 11th day of June to the 17th of January?

A. I think it would have been worth $100 a month to me if he hadn't been buying against me.

The material facts above set forth are not denied. The testimony thus proves, without contradiction, that the plaintiff in error, having sold his business and the good-will thereof to the defendant in error, with an agreement not to do business at that point, deliberately violated his agreement.

In *Carey v. Gunnison*, 17 N. W. Rep., 885, the supreme court of Iowa thus speaks of good-will: "The good-will connected with the establishment of any particular trade or occupation may be the subject of barter and sale. It is a valuable right, and if it be unlawfully destroyed or taken away, the law will award compensation to the injured party. It is defined to be 'the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stocks, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers on account of its local position or common celebrity, or reputation for skill, affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudice.' (Bouv., Law Dict.; Story, Partn., sec. 99.) We do not understand that counsel for defendant claims that what may be properly called 'good-will' is not the subject of contract, and that one acquiring it may not maintain an action for its deprivation. But he insists that that for which defendant seeks to recover in this action is not properly good-will, but rather profits of trade. The distinction between the two is obvious. Profits are the gains realized from trade; good-will is that which brings

trade. A favorable location of a mercantile establishment, or the habit of customers to resort to a particular locality, will bring trade. This advantage may be designated by the term 'good-will.' What the trader gains from the trade so acquired are profits. If by any means customers are driven from a particular locality to which they resort for trade, it is plain that the trade loses that which we have described as good-will."

In *Churton v. Douglas*, Johns. Eng. Ch., 174, it is said: "It was argued that in *Shackle v. Baker*, 14 Vesey, 468, *Cruttwell v. Lye*, 17 Vesey, 335, and *Kennedy v. Lee*, 3 Mer., 452, Lord Eldon has laid down the principle that an assignment of the 'good-will' of a trade, *simpliciter* carries no more with it than the advantage of occupying the premises which were occupied by the former firm, and the chance you thereby have of the customers of the former firm being attracted to those premises. But it would be taking too narrow a view of what is there laid down by Lord Eldon to say that it is confined to that. 'Good-will,' I apprehend, must mean every advantage, every positive advantage, if I may so express it, as contrasted with the negative advantage of the late partner not carrying on the business himself, that has been acquired by the old firm in carrying on its business, whether connected with the premises in which the business was previously carried on, or with the name of the late firm, or with any other matter carrying with it the benefit of the business. When Lord Eldon, in speaking of a nursery garden or a locality which the customers must frequent to look at the plants or other things, and when Sir Thomas Plumer, in another case, in speaking of a retail shop which a person must enter in order to buy the goods there exposed, they are only, as it appears to me, giving those as illustrations of what good-will is. But it would be absurd to say that where a large wholesale business is conducted, the public are mindful whether it is carried on at one end of the Strand or the other, or in

Fleet street, or in the Strand or any place adjoining, and that they regard that and do not regard the identity of the house of business, namely, the firm."

In *Sheppard v. Boggs*, 9 Neb., 257, and *Wallingford v. Burr*, 17 Neb., 137, this court held that the good-will of a business was an element of value which was the subject of sale in connection with the sale of the business. In the case at bar the plaintiff in error sold his business with the good-will to the defendant in error for $1,000, and was paid the consideration. One provision of the agreement was that he was not to do business at that point. He also reported that the business was worth $100 per month. He engaged in business again at Odell, in violation of his contract, and evidently sought to break up the business of the defendant in error. Thus, after a number of farmers had sold their hogs to the defendant in error for as high a price as the market would bear, the plaintiff in error came in and offered the sellers a greater price. The evident object was to create dissatisfaction and injure the defendant in error's business. The plaintiff in error complains that he made no money in the purchase of stock during this time. This merely corroborates the testimony of plaintiff below, that he was paying all that the market would bear, and that the defendant in error frequently offered more. The latter was clearly in the wrong. He not only violated his agreement, but the award of the arbitrators, and we cannot say that the damages are excessive. They do not amount to $50 per month. The plaintiff in error should do business at some other point, or else repurchase the business from the defendant in error. Honesty and fair dealing require him to adhere to his contract. Upon the whole case there is no material error in the record, and the judgment is

AFFIRMED.