## APPEAL OF C. F. HOVEY CO.

Docket No. 5448.   Submitted February 11, 1926.   Decided June 22, 1926.

The value of good will paid in to a corporation for shares of capital stock determined.

*Frank J. Albus, Esq.*, for the petitioner.
*F. O. Graves, Esq.*, for the Commissioner.

Before SMITH, JAMES,[1] LITTLETON, and TRUSSELL.

This appeal is from the determination of a net deficiency of $3,943.95 in income and profits tax for the three years ended

---

[1] This decision was prepared during Mr. James' term of office.

January 31, 1917, January 31, 1918, and January 31, 1920, as follows:

| Fiscal year ended— | Deficiency in tax | Overassesment |
|---|---|---|
| January 31, 1917 | | $68. 92 |
| January 31, 1918 | $1, 127. 81 | |
| January 31, 1920 | 2, 885. 06 | |
| Total | 4, 012. 87 | 68. 92 |

The point in issue is the exclusion from invested capital of $200,000 for good will acquired with shares of stock in 1914.

### FINDINGS OF FACT.

The taxpayer is one of the oldest, if not the oldest department store in New England. It began business on May 1, 1838. Since 1847 it has occupied its present location on Summer Street, only one or two doors from Washington Street, in Boston, Mass. The store is located in the heart of the retail shopping district of the city.

It was incorporated in September, 1914, with a capital stock of $1,000,000, $800,000 of which was issued for tangible assets and $200,000 for good will. At the time of incorporation the store dealt in general dry goods, dress goods, wash goods, shoes, ladies' wear, children's wear, and men's goods.

The average yearly capital and average yearly earnings of the business from 1848 to 1914 were $1,276,361.46 and $184,373.40, respectively; corresponding figures for the period 1900 to 1914, inclusive, were $1,404,595.44 and $171,951.83, respectively; and for the period 1910 to 1914, inclusive, were $1,199,691.11 and $34,911.35, respectively. The percentage of earnings to average capital for the entire period of sixty-six years was 14.45 per cent. For the years prior to 1909 the percentage earned was on the average considerably in excess of 15 per cent. Percentages for the years 1909 to 1913 were as follows:

| Year: | Per cent |
|---|---|
| 1909 | 8. 59 |
| 1910 | 8. 39 |
| 1911 | 2. 45 |
| 1912 | .97 |
| 1913 | 1. 46 |

Operations resulted in a small net loss for the year 1914.

Although the profits during the period 1909 to 1914 were less than for any corresponding period in the history of the company, there was a steady increase in the number of customers at the store and a steady increase in the number of customers' accounts.

There were special reasons for reduced profits during the period 1909 to 1914. During this period the Jordan-Marsh Co. had built an annex with an entrance on Summer Street, which entrance was across the street from the taxpayer's entrance. During the period also, Filene's, Inc., had opened a large store on Washington Street in the neighborhood. The entire department store business in the city was, moreover, subject to the keenest competition during this period as the result of the operations of one Henry Siegel and one Butler. The former had built a large store a little farther south on Washington Street than the junction of Summer and Washington Streets, and Butler had gotten possession of Gilchrist's, another large department store on Washington Street, and had also opened two other stores in the city, one on Tremont Street and one on Winter Street. Both Siegel and Butler carried on extensive advertising programs and conducted a price-slashing campaign that eventually carried them both into bankruptcy. Siegel's store was in bankruptcy prior to 1914, and Butler, as a result of financial troubles, committed suicide in November, 1912. The stocks of merchandise carried by the stores operated by Siegel and Butler were thrown upon the market in bankruptcy sales, with the result that for a year or two the department stores in Boston made small profits.

In September, 1914, the outstanding capital stock of the taxpayer was $1,000,000. It stood at the same amount until after January 31, 1919. On January 31, 1920, the total outstanding capital stock was $2,000,000.

OPINION.

SMITH: The only question presented by this appeal is the value for invested capital purposes of the good will of the C. F. Hovey Co. paid in to the taxpayer corporation in exchange for $200,000 of its capital stock in September, 1914. The Commissioner has disallowed the claim of the taxpayer for any invested capital in respect of this asset, upon the ground that it has not proven any cash value for it; that for a period of five years prior to 1915 the taxpayer had operated at a small profit and operated at an actual loss in the year 1914. The taxpayer contends on the other hand that the good will of the company paid in for shares of stock had a cash value of at least $200,000 in September, 1914.

We think that the fact that the business of the C. F. Hovey Co. during the period 1909 to 1914 was not particularly profitable does not prove that the good will did not have a cash value. The value of good will may not be indicated by the profits of a business for a short period. In the case of *Macfadden* v. *Jenkins*, 40 N. D. 422;

50144°—27——15

169 N. W. 151, it was held that good will may have a value although there have been no past profits. The distinction between " profits " and " good will " was determined in the case of *Nelson* v. *Hiatt*, 38 Neb. 478; 56 N. W. 1029, wherein the court said:

The distinction between the two [profits and good will] is obvious. Profits are the gains realized from trade; good will is that which brings trade. A favorable location of a mercantile establishment, or the habit of customers to resort to a particular locality, will bring trade. This advantage may be designated by the term " good will." What the trader gains from the trade so acquired are " profits."

In determining that the good will of C. F. Hovey Co. had no value in September, 1914, the Commissioner considered the results of operations for a period of five years only. We think that no definite number of years can be made to apply to all cases. In *In re Herrmann's Estate*, 180 N. Y. S. 509, it was held that the length of the period to be considered is to be determined in each particular case. The number of years to be considered is not a question of law but one of fact. *In re Ball's Estate*, 161 App. Div. 79; 146 N. Y. S. 499; *Von Au* v. *Magenheimer*, 126 App. Div. 257; 110 N. Y. S. 629.

It will be noted from the findings of fact that for the period from 1900 to 1914 the average yearly capital of the C. F. Hovey Co. was $1,404,595.44 and the average yearly earnings $171,951.83. If this period be taken as the basis for the computation of the value of the good will, instead of the five-year period used by the Commissioner, and an 8 per cent return be considered a fair return on tangibles, the excess average annual earnings for the period applicable to good will is $59,584.19, which capitalized upon a five-year purchase basis, as was done in the *Appeal of St. Louis Screw Co.*, 2 B. T. A. 649, gives a value for the good will in excess of $200,000.

In this appeal we do not, however, have to rely entirely upon the basis of earnings for the purpose of arriving at a cash value of the good will in 1914. There has been introduced in evidence the deposition of Maurice Wrigley, director and treasurer of the Jordan-Marsh Co. Relative to the value of the good will of the taxpayer he testified as follows:

Q. Mr. Wrigley, with your experience in the dry goods business, would you state what, in your opinion, is a fair figure for the good will of the Hovey Company as of 1914?

A. Well, of course, I am not familiar with the Hovey Company balance sheets, and I don't know anything about the Hovey Company business as of those dates. As I remember, the Hovey Company is one of the oldest establishments of Boston, ranking as high as any in the early days of the 80's and 90's; in fact, in the early 90's, the Hovey Company was a very high-grade store and held at that time high-grade trade. The old Back Bay people of

Boston naturally were on the Hovey clientele list. It had a good name and a good reputation.

When you go down to 1914, the Hovey Company conducted a wholesale business and a retail business; they stressed, of course, wholesale in the early years. In the later years, from my observation, I would say that in the retail end they did not keep up the same merchandise grades as before, although I believe they held the old clientele. I think to this day they are holding a good part of the clientele of the old Hovey store.

Q. With your experience in the dry goods business, would you be willing to express your opinion as to what the good will might have been worth in 1914 in dollars and cents?

A. Well, you see that is really something you have to get to some extent through financial statements of condition to express an opinion as to the good will of the business, but it seems to me that if anyone wanted to buy Hovey's store there would be a good will in the name alone of C. F. Hovey Company which would have quite some value. I should think the Jordan-Marsh Company if they were an outsider coming into Boston wanting to buy the store would be willing to pay considerable merely for the name of C. F. Hovey Company with that class of store, because it was a store similar to ours and with a clientele considered to be high grade; and if we were going to come to Boston, to buy a business of that kind we would be quite willing to pay a good deal just for the Hovey name.

Q. Regardless of any reference to balance sheets that might give you something concrete upon which to place a valuation for good will, would you be willing to express any opinion as to the value of the good will of Hovey Company in 1914—that is, in dollars and cents?

A. Well, I could only say that, speaking in connection with ourselves, if we were outsiders, I should think that Jordan-Marsh Company would no doubt be willing to give a quarter of a million dollars for the good will that was there—you know there is a business already established. It is an old concern. It had the cream of the trade of Boston; and Hovey's reputation had not suffered, to my knowledge, up to 1914. I don't know anything about their business results. There was the Hovey business with a very high reputation, and it seems to me that to any one coming in, that name was a valuable name and carried under that name Boston's best clientele. I think if we took the Hovey store we would develop that name and have a very good prestige in the name alone.

We think that the evidence satisfactorily establishes that the good will of the C. F. Hovey Company paid in to the taxpayer corporation in September, 1914, for $200,000 of capital stock had a cash value on that date of $200,000.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*