MAX M. BARISH, APPELLANT, V. CHRYSLER CORPORATION ET AL., APPELLEES.

3 N. W. (2d) 91

FILED MARCH 20, 1942. No. 31193.

*Webb, Beber, Klutznick & Kelley, Loyal G. Kaplan* and *Harold R. Lebens,* for appellant.

*Crofoot, Fraser, Connolly & Stryker, Fred N. Hellner* and *Kennedy, Holland, De Lacy & Svoboda, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ., and POLK, District Judge.

EBERLY, J.

This is an action for tort brought by Barish in the district court for Douglas county, against the defendants named to recover treble damages under the Junkin Act of Nebraska, for injuries in his business and property by reason of the results of a conspiracy declared unlawful by the terms of that enactment referred to, and alleged to have been participated in by the defendants. At the close of plaintiff's evidence, the trial court, upon the several motions of the defendants, directed the trial jury to return a verdict for the defendants, and dismissed plaintiff's petition, and later also overruled plaintiff's motion for a new trial. The plaintiff appeals.

It may be said that among the facts established by the pleadings and the evidence are the following: The defendants Chrysler Corporation and Dodge Brothers Corporation are automobile manufacturers engaged in the manufacture of automobiles and the distribution of same throughout the United States, through representative dealers. At the times involved herein Barish-Sanders Motor Company, a Nebraska corporation, was the dealer possessed of the usual franchise and was handling the products of the defendants "Chrysler" and "Dodge" in Omaha and vicinity. The plaintiff Barish was the president and general manager of Barish-Sanders Motor Company, and actively engaged in the management of its business. He owned 75 shares of common stock of Barish-Sanders Motor Company. There was also outstanding $30,000 of preferred stock issued by the company last named, which was owned by Ben Sanders and the Hubbell family of Des Moines, Iowa, who also owned the remaining 125 shares

of the common stock. The board of directors of Barish-Sanders Motor Company, at all times involved herein, was Max M. Barish, plaintiff, Ben Sanders and James Hubbell. Sanders and the Hubbells were owners of a majority of the stock of a Des Moines, Iowa, company which was engaged in the same business at that place that was being carried on by Barish-Sanders Motor Company at Omaha. The defendants Commercial Credit Company, a Nebraska corporation, and Commercial Credit Company, a Delaware corporation, are engaged in the business of purchasing retail and wholesale commercial paper from automobile distributors and dealers, and also in the business of financing automobile transactions. They were affiliated organizations. The Chrysler Corporation also entered into a direct dealers agreement with Barish-Sanders Motor Company covering the sale and distribution by the latter of Dodge and Plymouth motor products in Cass, Douglas, Washington and Sarpy counties in Nebraska, and in Harrison county, Iowa. This contract is usually termed a "franchise" in the trade, and contains stipulations as to the rights and duties of all the parties to the same with reference to the subject-matter of the agreement. It provided, among other things, for "Termination without Notice" for various reasons, such as an attempted assignment by the direct dealer, its bankruptcy or receivership. It also provided for "Termination Upon Cessation of Proper Representation," if in the opinion of the Chrysler Corporation the direct dealer shall have ceased proper representation in his territory, the company to immediately notify the dealer in writing of such termination. It also provided for "Termination by Notice" as hereinafter set forth; and for "No Liability on account of Termination" as later stated in this opinion.

The foregoing agreement was executed in writing February 19, 1936, and was in effect at all times involved in this litigation. It was signed on behalf of Barish-Sanders Motor Company by the plaintiff, as "M. M. Barish, Pres." On October 15, 1936, the Barish-Sanders Motor Company

became a "Parts Wholesale Dealer" in the Dodge division of the Chrysler Corporation, under the terms of a contract then executed by it which also contained provisions similar to and substantially identical with its automobile franchise contract executed February 19, 1936, with reference to termination thereof.

These contracts are strictly corporation contracts, and as such binding only upon the corporate entities that are the makers thereof, and necessarily subject to all the limitations therein expressed. It follows that causes of action in the nature of tort arising from, growing out of, or pertaining to the obligations or duties created or declared thereby are necessarily limited in scope by the terms thereof.

The relations between the Chrysler Corporation and the two Commercial Credit Companies, defendants, were substantially created and fixed by the terms of a written contract entered into between it and the Commercial Credit Company, a Delaware corporation, effective January 1, 1935, and which remained in full force during the entire period covered by the events involved in the present suit. The Commercial Credit Company, a Nebraska corporation, was an affiliate company of the Delaware corporation of that name, and also a beneficiary of the contract last referred to. So far as involved in the present litigation, it may be said that this contract evidenced an agreement that the Chrysler Corporation would, "by proper means, to encourage, endorse, promote, recommend, develop and endeavor to bring about the use by its dealers of the financing plans and facilities of Commercial Credit in connection with the sale by its dealers of Chrysler cars on a time payment plan basis * * * . (b) To mention in advertising and in radio broadcasts that Commercial Credit is the finance company approved and recommended by Chrysler. (c) To furnish a letter of recommendation, facsimiles of which Commercial Credit may use in advertising and on its finance charts and plans."

In consideration thereof, the Commercial Credit Com-

pany, a Delaware corporation, agreed to pay the Chrysler Corporation for such services not less than a minimum of $150,000 for each calendar year. This agreement also provided that the Commercial Credit Company, a Delaware corporation, might cause the contract to be performed by any or all of its affiliated companies, and that this contract should be for the benefit of all of the same.

It must be obvious that the success of the Chrysler Corporation under the set-up heretofore detailed was wholly dependent on the number of its automobiles sold and the amount of its products disposed of by the Barish-Sanders Motor Company. As a matter of necessary precaution, it was the adopted business policy of the former to keep in close touch with the business transacted by the latter; to aid, advise, and cooperate with the latter to the end that the interests of both, if possible, be advanced. In the event that the relation between these parties should become unsatisfactory for any reason, the contracts above referred to contemplated that either party thereto could at his own option terminate the same without liability for damages to the other. In line with this policy thus outlined, representatives of Chrysler Corporation and of the Barish-Sanders Motor Company discussed each year the prospective sales for the coming year and agreed upon quotas which the dealer believed represented the number of automobiles he could sell in his territory. It appears that Barish-Sanders Motor Company did not sell its quota of cars in 1936 or 1937. In fact, it did not sell as large a percentage of its quota as did the Sanders Motor Company at Des Moines, Iowa, and fell far below average sales of Plymouth and Dodge cars throughout the nation. Also, the Barish-Sanders Motor Company which had been financing with the Commercial Credit Company, because of difficulties arising which culminated about September 16, 1937, after full concurrence by its board of directors, concluded to quit and did cease doing business thereafter with the Commercial Credit Company, of which the latter was duly notified. It would accomplish no good result to detail the attempts to secure an adjust-

ment of these matters of difference. Suffice it to say that in legal effect the Chrysler Corporation determined, in view of the situation then prevailing, to exercise the rights reserved under the express terms of the two franchise contracts hereinbefore referred to, and to cancel and bring the same to an end. However, after duly advising the other contracting party of this conclusion, it extended to the Barish-Sanders Motor Company the opportunity of selling its business and property employed therein to its best advantage, and for which purpose it assisted and cooperated to effect that result.

On November 11, 1937, Messrs. Maxson, Mitchell and Jones, as purchasers, met the owners and representatives of the Barish-Sanders Motor Company at Omaha, Nebraska. Their negotiations resulted in the purchase of the motor company by these three men for an agreed consideration of $70,000. This sale contract was in writing, duly executed by the parties thereto, and accomplished the purchase by the sale and transfer of all stock, common and preferred, of the Barish-Sanders Motor Company to the three purchasers named, in consideration of the $70,000 by them paid. In addition, it was agreed as part of such sale that some trucks, inventoried at $2,043, were to be retained for the benefit of the old stockholders, and the purchasers also agreed to pay all taxes assessed against the property of the Barish-Sanders Motor Company so purchased. The stock transfer made was complete, absolute and without reservation except as above stated and included all stock owned by Barish. On November 15, 1937, a written agreement expressly terminating the Chrysler Corporation direct dealer agreement with Barish-Sanders Motor Company was duly executed, the plaintiff Barish signing for the motor company. On December 3, 1937, by mutual consent, the "parts wholesale agreement" between the Chrysler Corporation and the Barish-Sanders Motor Company was terminated and canceled by a written instrument which was executed in a manner identical with the contract terminating the direct dealer agreement.

It also appears that the consideration received was duly apportioned to and received by the selling stockholders of the Barish-Sanders Motor Company, and that thereupon the purchasers as owners of the stock went into possession of this company and became the owners of all of its properties, rights and credits of every description. On November 20, 1937, at a meeting presided over by Max M. Barish, plaintiff, after the transfer of stock to Maxson, Mitchell and Jones had been duly made, by unanimous consent of all stockholders in interest, the name of the corporation was changed to "Maxson-Mitchell, Inc." Max M. Barish continued with the Barish-Sanders Motor Company, after the change of name, during the remainder of the month of November and also December, assisting the purchasers thereof in the conduct of its business. On April 29, 1938, he instituted the present action for himself and strictly in his individual capacity.

In this matter the following constitutes the certain basis of our consideration. We are here dealing strictly with two inter-corporation contracts. No one is affected by their terms except the corporate parties thereto. Officers and stockholders of the corporations involved could not possibly be affected thereby except indirectly through the medium of corporate stock ownership and the rights and powers derived therefrom.

In consideration of the Junkin Act, under the terms of which this action purports to be brought, this court unanimously announced the proposition that in business such as here involved, "A person may do business with whomsoever he desires. He may likewise refuse business relations with any person whomsoever, whether the refusal is based on reason, whim or prejudice." *Hompes v. Goodrich Co.,* 137 Neb. 84, 288 N. W. 367.

We have repeatedly announced, in substance, this rule, "That contracts for the performance of services or for the continuous furnishing of commodities are, when the contract itself specifies no period of duration, terminable, upon reasonable notice, at the will of either party." *Smith v.*

*Bailey,* 105 Neb. 754, 181 N. W. 926. See, also, *State v. Employers of Labor,* 102 Neb. 768, 169 N. W. 717; *Great Atlantic & Pacific Tea Co. v. Cream of Wheat Co.,* 227 Fed. 46.

In the instant case the parties have expressly agreed, in both contracts in issue, as follows:

"It is agreed that either party may terminate this agreement with or without cause at any time upon not less than fifteen (15) days' nor more than twenty (20) days' written notice to the other party either by personal delivery or by registered mail to the last known address. * * *

"It is agreed that neither party shall be liable to the other for damages of any kind on account of termination of this agreement with or without notice as provided herein * * *."

These stipulations are valid and binding upon the parties to these contracts and those claiming by, through, or under them. Indeed, the parties to these contracts by their subsequent valid agreements of cancelation and termination thereof admit the contractual validity of these engagements, and their acts so performed must be upheld. *Warren-Scharf Asphalt Paving Co. v. Laclede Construction Co.,* 111 Fed. 695. Without reference to the legal effect of these express stipulations as to the terminability of these written obligations, the common-law rule is that, in the absence of a business charged with a public interest or facts involving similar principles, which do not appear in the present case, "One who causes intended or unintended harm to another by refusing to enter into a business relation with the other or to continue a business relation terminable at his will is not liable for that harm," so occasioned. Restatement, Torts, sec. 762. See, also, *Smith v. Bailey, supra; State v. Employers of Labor, supra.*

Obviously, there can be no recovery under the facts in this case against the Chrysler Corporation because of its exercise of its contractual rights or its enforcement of the contractual obligations of the two contracts here involved.

True, the plaintiff sues as an individual in tort, but in

order that his cause of action be deemed sustainable, it must be found in some manner to arise out of the express terms or necessary results of the two contracts between the Chrysler Corporation and the Barish-Sanders Motor Company. Plaintiff's rights must be deemed wholly derivative, because he is neither a party to the contracts nor affected thereby except as a stockholder or officer of the corporation that made the contracts here in issue. But an individual stockholder or officer of a corporation cannot personally maintain an action for damages for a conspiracy which is claimed to violate the Junkin Act when, as here, the evidence conclusively shows that all conduct as well as contracts of the defendants, challenged by this suit brought, involve a corporation or corporate rights. He can be entitled to no rights, remedies or relief because of the existence of these contracts, except by or through the rights of the actual parties thereto. *Ploog v. Roberts Dairy Co.*, 122 Neb. 540, 240 N. W. 764; *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U. S. 261, 37 S. Ct. 509; 7 Thompson, Corporations (3d ed.) 593, sec. 5595.

So too, under our Junkin Act, recovery is limited to damages for injuries "in his business or his property." Thus, injuries to corporate business are not injuries to the business of an officer or stockholder in the corporation within the meaning of the Junkin Act and for such injuries only the corporation may pursue the statutory remedy. Loss of a corporate office and salary incident thereto is not "injury to business or property" within the meaning of the statute. Nor is the impairment of the value of plaintiff's shares in the corporation, nor loss of prospective dividends thereon, "injury to business or property" as those terms are employed in the statute here involved. *Gerli v. Silk Ass'n*, 36 Fed. (2d) 959; *Westmoreland Asbestos Co. v. Johns-Manville Corporation*, 30 Fed. Supp. 389; *Corey v. Boston Ice Co.*, 207 Fed. 465; *United Copper Securities Co. v. Amalgamated Copper Co.*, 244 U. S. 261, 37 S. Ct. 509; 7 Thompson, Corporations (3d ed.) 593, sec. 5595.

Then again, it appears that the plaintiff sold his stock

prior to the commencement of the present action, and it does not appear that demand was made upon the motor company which must be deemed to possess and own the cause of action, if such cause exists, which plaintiff now seeks to allege in his own behalf. But, he parted with ownership of the stock before the institution of the present action. It follows that he could make no legal demand on the corporation to institute this proceeding nor maintain it in his own behalf. Again, his action, though allegedly set forth as a tort, of necessity must arise out of, or flow from, the contracts which are both subject to cancelation upon fifteen days' notice, and which were both actually terminated by mutual agreement of the parties thereto. Under the circumstances of this case there can be no recovery for future profits or future salaries, as an element of damages in a tort action, after the due termination and cancelation by the parties thereto of the contracts, whose continued existence furnishes the basis of the same. *James Poultry Co. v. City of Nebraska City*, 135 Neb. 787, 284 N. W. 273; *Ploog v. Roberts Dairy Co.*, 122 Neb. 540, 240 N. W. 764; *White Sewing Machine Co. v. Shaddock*, 79 Ark. 220, 95 S. W. 143; *White Co. v. American Motor Car Co.*, 11 Ga. App. 285, 75 S. E. 345; *Standard Motor Co. v. Shockey*, 139 Md. 127, 114 Atl. 869; *State v. Trimble*, 295 Mo. 667, 247 S. W. 119; *Kilker v. Ford Motor Co.*, 39 S. Dak. 293, 164 N. W. 57.

It appearing that there can be no recovery in this action upon the theory presented by the plaintiff, the other questions presented by the record are, in effect, moot and unnecessary to the determination of this case.

It follows that the judgment of dismissal entered by the district court in this case is correct, and it is

AFFIRMED.