FRANK H. GIBSON, INC., A CORPORATION, APPELLANT AND CROSS-APPELLEE, v. OMAHA COFFEE COMPANY, A CORPORATION, ET AL., APPELLEES AND CROSS-APPELLANTS.

137 N. W. 2d 701

Filed October 29, 1965. No. 35793.

170

Pilcher, Howard & Hickman, for appellant.

Fraser, Stryker, Marshall & Veach, for appellees.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, BROWER, SMITH, and McCOWN, JJ.

SPENCER, J.

This case was previously heard herein. Our former opinion, reported at 178 Neb. 329, 133 N. W. 2d 462, reversed the judgment of the trial court and remanded the cause with directions to enter dismissal of the action on

the defendants' cross-appeal. We now determine that our former opinion should be vacated.

This is an action brought by plaintiff, Frank H. Gibson, Inc., hereinafter referred to as Gibson, against Omaha Coffee Company, E. C. Conroy Coffee Company, Inc., hereinafter referred to as Conroy, and Kenneth Loseke, for damages alleged to have resulted from a conspiracy to purchase plaintiff's business on their own terms, and if unable to do so, to take over plaintiff's sales force, coffee routes, and customers.

In the trial of the action to a jury, Gibson recovered a judgment of $20,000. The trial court sustained a motion for a new trial. Gibson perfected an appeal, and the defendants perfected a cross-appeal.

Gibson was incorporated in 1931. At all times involved in this litigation, Edgar J. Bellows was its president, treasurer, and manager, and the owner of 625 shares of its stock. His wife was the owner of 10 shares. Kenneth Loseke was vice president and secretary, and the owner of 100 shares of stock for which he paid $2,500 in 1952. Bellows, his wife, and Loseke were the directors of the corporation, and the owners of all of its stock. George Christian, Mel Oliver, and Bill Dickens, along with Loseke, were the coffee salesmen employed by Gibson. Loseke was the customer's serviceman and supervised Gibson operations. For 2 months each summer he was in sole charge of the business. The business of Gibson was the selling of coffee, teas, and sundry items, primarily to restaurants, cafes, hospitals, factories, and other commercial enterprises, within a radius of 150 miles of Omaha. As a part of its business, Gibson provided certain equipment to regular customers using its products. The customers were served by established truck routes, over which the salesmen heretofore mentioned regularly delivered the products of the company. These salesmen were long-time, experienced employees, and operated without formal contracts of employment. For 2 years prior to October 1, 1962, Gibson had pur-

chased all of its coffee from Conroy, whose place of business was in Kansas City, Missouri. These purchases amounted to approximately $150,000 per year. Conroy was not in the retail business but was strictly a wholesaler, and had no retail sales force available.

Edgar J. Bellows, who will hereafter be referred to as Bellows, was referred to in our previous opinion as being 74 years old. His age is not a matter of record, but from statements made on rehearing, his age was overstated in our former opinion by at least 13 years. Bellows testified that before leaving on a vacation August 19, 1962, he visited with his auditor and with Loseke about the possibility of selling Gibson because of his health, age, and business competition, and authorized the auditor to explore the possibility. The auditor made contact with the Continental Coffee Company and Conroy. Bellows did not return from his vacation until September. He had his first conference with Continental Coffee Company on September 11, 1962. At that time Continental made an offer for Gibson good will of $5 per pound on the average weekly coffee sales for the preceding 1-year period. It is undisputed that this average was 6,000 pounds per week, so the offer was for $30,000, exclusive of physical assets. According to plaintiff's evidence, employment was also offered certain Gibson employees, with or without contract, at a higher rate of pay.

The jury returned a verdict for the plaintiff, so this record must be reviewed in the light of the following rule: "In determining the sufficiency of evidence to sustain a verdict it must be considered most favorably to the successful party, any controverted fact resolved in his favor, and he must have the benefit of inferences reasonably deducible from it." Graves v. Bednar, 171 Neb. 499, 107 N. W. 2d 12.

On September 12, 1962, Bellows had a conference at a motel in Omaha with Ralph Clark, who will hereinafter be referred to as Clark, president and sole stock-

holder of Conroy. The conference adjourned until the next morning. When Bellows and his wife returned the next morning, they observed papers scattered about the room on which appeared the names of Gibson customers. Clark then stated that Loseke had furnished him the names of the customers. It was Bellows' testimony that he had not authorized Loseke to negotiate any sale with Conroy, and particularly did not authorize the furnishing of the names of Gibson customers.

Clark and Bellows met the next day when the officers and stockholders of Gibson were discussed. Bellows quotes Clark as saying, with reference to Loseke's stock: " 'Well, you won't need to worry about that too much.' * * * 'We'll take care of Mr. Loseke on his stock.' " They then went to the auditor's office to examine the tax and operating statements of the company. At the next meeting, on September 17, 1962, the sale of the equipment was discussed. Bellows' testimony is that Clark on that occasion said: " 'Well, if we can't work something out,' * * * 'we are prepared to go into business ourselves, set up our own company. Your boys, men, have agreed to go with us, and we will start this company and start delivery of coffee to your customers next Monday morning." Bellows testified that he was flabbergasted by this and left almost immediately.

A further meeting was held the next day, at which time Clark stated he would have a contract drawn by his attorney in Kansas City. The following day, Clark met Bellows in an automobile in front of Bellows' office. On this occasion, the testimony is that Clark said maybe they could figure out a deal for around $40,000 for the business. Dave Clark, son of Clark, then said: " 'Well, you know that we can go into business next Monday morning.' * * * 'We have room rented and trucks are available and merchandise can be brought in here overnight, and we'll start in next Monday morning.' " Clark again stated that the Gibson employees would go along with them.

Bellows first called his attorney the night of September 19, 1962. On September 21, 1962, a meeting was held in the office of Bellows' attorney. Present were Clark, Dave Clark, Clark's attorney, Bellows, Mrs. Bellows, Bellows' auditor, and Bellows' attorney. Mrs. Bellows, addressing Clark, said: " 'Ralph, I understand that you are going into business here in Omaha with our men and deliver our customers.' " Clark answered, " 'That's right, we are prepared to do that.' " The meeting broke up. Loseke then put in an appearance. Loseke, under questioning by Bellows' attorney, admitted that he and the Gibson salesmen would start with Conroy the next Monday. The attorney asked him and his men to stay with Gibson for another week, to permit an agreement to be worked out, to which he agreed. Bellows also testified that he had previously talked with Loseke about Clark's statement that he and the salesmen were going with Conroy, and asked: " 'Is that right?' " Loseke answered: " 'Yes, we have decided to do that.' " Bellows had also visited with two of the salesmen, who confirmed Loseke's statement, and Oliver told him, " 'Yes, that's right.' * * * 'We have decided to all stick together.' "

After the meeting in the attorney's office, Bellows instructed his attorney to see if Conroy would raise its offer $5,000 for an agreement by Bellows not to compete. It refused to do so. The attorney was then instructed to accept the Conroy offer. When he communicated this acceptance to Conroy, Clark said: " 'No, I have changed my mind, I am not going to offer that much.' " This ended the negotiations with Conroy.

The jury could reasonably have concluded that at this time, because he had the Gibson employees committed to Conroy, Clark decided he could get everything he needed and wanted on his own terms. It is not unreasonable to conclude that Clark took advantage of the situation and pirated the good will of the Gibson company. Drawing this inference, it is possible to conclude that the Gibson employees assumed they had a perfect right to

deal with Conroy. Whether or not they were acting in good faith, their commitment to Conroy afforded Conroy the opportunity to take over Gibson customers and routes without paying anything since Gibson would no longer have the means to continue operation. There is, in addition, the fact that when they did start out on October 1, 1962, the customers had to continue to use Gibson equipment until such time as it could be replaced by defendants.

Bellows testified that before the threats by Clark, he had not formed a definite intention to sell but was exploring the possibilities to see what type of a deal might be worked out. After he learned that Clark and Loseke had agreed to form another company and to take over the business with the Gibson sales force, he determined he had to sell to the highest bidder. There was no way to replace his salesmen on quick notice. The last coffee order to Conroy company had not been delivered and he would be out of business without a sales force, so he was forced to sell as best he could. He secured the authorization of the stockholders to sell and sold the physical assets of Gibson to Continental Coffee Company on September 28, 1962, at their book value. No good will was sold, although this fact is disputed by defendants.

Loseke testified that he was an officer and director of Gibson and was informed by Bellows that a sale was being negotiated. He testified that Bellows said the business was worth about $100,000, and that Bellows offered it to him but it was far beyond his range. He discussed the matter with the auditor. It was his testimony that he was not invited to annual meetings of the stockholders, and that he signed the minutes as prepared by the auditor. He was informed by the auditor of the contacts the auditor made pertaining to a possible sale, and was fully informed on the situation. He got permission from Bellows to call Clark about the sale, which he did. He had dealt with Clark on many occasions on

Gibson business. Clark came to Omaha pursuant to his call and met Loseke the same evening. Clark told him it was essential to the purchase by Conroy that the sales force go with it; and that Clark contacted the salesmen and ascertained that they would stay with Conroy if it bought the Gibson company. At Bellows' request he listed the physical assets, including loaned coffee makers, and gave it to Clark.

Loseke further testified that he and the other salesmen agreed to stay with Gibson as long as Bellows was operating the business and able to keep going. On Saturday, September 29, 1962, Bellows informed him that he had sold the business to Continental, and Loseke walked out. He saw Clark that afternoon and agreed to work for him. He went to work 2 days later, Monday, October 1, 1962. The other salesmen also showed up to work for Conroy. They met at the Watson terminal. There was coffee on the dock. They had four rented trucks. They loaded the trucks, and Dave Clark, who was present, told them to sell the coffee. Loseke knew that the Omaha Coffee Company had been formed and that the other employees had been contacted for employment. He had worked for the Omaha Coffee Company since October 1, 1962, as manager. He became a director of Omaha Coffee Company on November 8, 1962. He and the former employees of the Gibson company were still working for the Omaha Coffee Company at the time of trial.

Sometime previous to September 25, 1962, Clark had had articles of incorporation prepared for the Omaha Coffee Company, listing his Kansas City lawyers as the incorporators. These were filed with the Secretary of State on September 25, 1962. On Monday morning, October 1, 1962, Loseke and the sales employees of plaintiff met at the Watson Brothers dock in Omaha and loaded four leased trucks with 5,000 pounds of coffee which had been prepared in Kansas City by Conroy and shipped to Omaha. The amount to be shipped had pre-

viously been determined by Loseke. Conroy, which was solely owned by Clark, was the sole stockholder of the Omaha Coffee Company. It paid all the expenses incident to the organization and starting the business and guaranteed all of the expenses to be incurred by Omaha Coffee Company. Loseke and the route salesmen, on October 1, 1962, left the dock with the leased trucks and immediately started to cover the routes they had previously covered for Gibson, servicing its customers as though no change had occurred. Their testimony is that they told the customers Gibson had sold out and that they were working for a new company.

More than 3 months after October 1, 1962, with the exception of a beauty school and one cafe, all of the customers of the Omaha Coffee Company were customers of the plaintiff previous to the formation of the Omaha Coffee Company. On October 1, 1962, these customers were using stoves, coffee urns, and Cory coffee makers owned by the plaintiff and loaned to them as customers. These customers continued to use this equipment until it could be replaced by the Omaha Coffee Company.

Does the plaintiff have a cause of action for damages? Our former opinion held there was insufficient evidence to raise a jury question, and directed a dismissal. We now determine this to be erroneous.

This record presented a fact question. The jury is the sole judge on all fact questions. To justify this court in interfering with the findings of a jury on a fact question, the preponderance of the evidence must be so clearly and obviously contrary to the findings that it is the duty of the reviewing court to correct the mistake. See Beavers v. Christensen, 176 Neb. 162, 125 N. W. 2d 551.

While the employees did not actually leave Gibson until the sale of the physical assets, they were committed to do so. Their commitment enabled Conroy to rescind its previous offer and to obtain the good will of Gibson at no cost. Clark knew the importance of Loseke,

a director and an officer, to the Gibson operation. The new company was formed after Clark's conference with Loseke and several days before he withdrew the Conroy offer. Without Loseke's cooperation, the new company would be a mere paper organization. Conroy could not get the Gibson business without its employees.

Defendants direct our attention to Reid v. Brechet, 117 Neb. 411, 220 N. W. 590, in which we said: "An action of conspiracy sounds essentially in tort. * * * The principle element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It involves some mutual mental action coupled with an intent to commit the act which results in injury. Without the scienter persons cannot conspire." They argue plaintiff must show some point in time where defendants reached the intent to commit the act resulting in the injury.

In this case, there is sufficient evidence from which the jury could determine that Conroy induced Loseke to commit an actionable wrong in violation of his fiduciary duty. It knew his fiduciary relationship with Gibson and understood the effect of its action. To say that Loseke could be liable, and the instigator who was the beneficiary not liable, is to ignore the obvious. It is also possible for the jury to infer that Conroy, on the pretense of purchasing, examined the plaintiff's books, contacted its employees, and according to the testimony of Bellows, surreptitiously secured a list of its customers, and then withdrew its offer of purchase. The important asset of Gibson was not its equipment but its customer routes. This is evidenced by the fact that several months after their appropriation, the defendants had been able to add only two new accounts.

As defendants pointed out, we said in Barish v. Chrysler Corp., 141 Neb. 157, 3 N. W. 2d 91: "Any person may do business with whomsover he desires. Also, he may refuse business relations with any person whomsoever, * * *. One who causes intended or unintended harm to

another by refusing to continue a business relation with him, terminable at his will, is not liable for that harm."

However, in the instant case we have a different situation. We do not have a refusal to do business, but rather an attempt to steal a business by taking unfair advantage of a business relationship. Here we have Clark working with Loseke, a fiduciary, to force a sale to Conroy on its own terms or to destroy the good will of Gibson. Proof of the intent, understanding, or agreement in such instances must usually rest largely on inferences. Here, however, we have direct testimony on the intent of Conroy, corroborated essentially by legitimate inferences from Loseke's actions. Also, the preliminary preparation and the promptness with which the defendants took over the Gibson routes can substantiate the inference of a preconceived plan.

The jury could reasonably find, as it must have done, that Bellows was forced to sell the company because of the conspiracy between Loseke and Conroy, and that this conspiracy entirely destroyed the good will of the plaintiff. In Nelson v. Hiatt, 38 Neb. 478, 56 N. W. 1029, we said: "In Sheppard v. Boggs, 9 Neb., 257, and Wallingford v. Burr, 17 Neb., 137, this court held that the good-will of a business was an element of value which was the subject of sale in connection with the sale of the business." In that same case, we quoted the following from an Iowa case, Carey v. Gunnison, 17 N. W. 885: " 'The good-will connected with the establishment of any particular trade or occupation may be the subject of barter and sale. It is a valuable right, and if it be unlawfully destroyed or taken away, the law will award compensation to the injured party.' "

There can be little doubt that it was possible for the jury to find that a conspiracy existed to take over the plaintiff's business. Such conspiracy may be established by circumstantial evidence or by deduction from facts. See Marsh-Burke Co. v. Yost, 98 Neb. 523, 153 N. W. 573.

In our former opinion we stated: "Defendant Conroy

Coffee Company had ample reason, and in the interest of good business, to take the action that it took in order to protect its business which would be lost to a competitor." This statement was erroneous. It had a right to protect its business, but not in the way it endeavored to do so. A legitimate purpose does not justify an unlawful act. It is undisputed in the record that Conroy was not in the retail business; that it had no retail business in the area; that it had no retail sales force available; and that the only way it could accomplish its purpose was by inducing a fiduciary to help it to take over plaintiff's sales force and by appropriating the use of plaintiff's equipment to its own purpose until it could replace it with its own. This is not a matter of competition except as it may be described as an unfair competitive practice. It is not a matter of simply hiring plaintiff's employees after a sale has been made to a competitor to call on plaintiff's former customers. Rather, a proper inference is that it was an agreement made previous to any offer of sale to take over the Gibson business if Conroy could not force a sale on its own terms (and the evidence is that when those terms were met, it changed its terms). It is the preconceived plan to accomplish this purpose which is illegal and which under plaintiff's theory forced the sale of the business and destroyed the good will of the plaintiff's business. "For harm resulting to a third person from the tortious conduct of another, a person is liable if he (a) orders or induces such conduct, knowing of the conditions under which the act is done or intending the consequences which ensue, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement, Torts, § 876, p. 435.

Our former opinion stated as follows: "The defend-

ant Loseke and other employees, having no contract of employment, could individually, without question, bargain for a contract of employment with whom they chose. This they could also do in concert with each other without it being illegal or for a wrongful purpose." There is no question that any of the plaintiff's employees, including Loseke, could leave plaintiff's employ at any time and take employment with anyone else, and it is not their leaving the employ that is actionable. It is the agreement before any sale that unless a sale was made to Conroy they would take over the Gibson business. This was not an agreement to solicit former customers for a new employer but an agreement to actually transfer the accounts without solicitation.

An officer or director of a corporation occupies a fiduciary relation towards the corporation and its stockholders. Fisher v. National Mtg. Loan Co., 132 Neb. 185, 271 N. W. 433. The jury could have found it was Loseke, who had a fiduciary duty regardless of the fact that we characterized it as nominal in our former opinion, who acted for Conroy to induce the other employees to leave in a body and to carry through for Conroy. This would make it impossible for the plaintiff to service its customers and would immediately enable the new employer to service those customers. Without Loseke and the other salesmen, Conroy could not have accomplished its scheme. Without the Conroy company, Loseke could not have accomplished this scheme. By acting in concert they could do so, and it was their joining together to do what they did that was wrongful and is actionable. The test for determining the lawfulness of the combination is the motive for it, or the nature of the result to be obtained as a consequence.

The rule enunciated in Scavenger Service Corp. v. Courtney, 85 F. 2d 825, is applicable herein. It is there said: "The consipiracy was one to ruin appellant's business. Therefore the means adopted were unlawful. The actionable character of the means may be and often

is determined by the use to which they are put. If, therefore, individuals conspired to commit the wrongful act of ruining appellant's business, the means, even though of themselves innocent, were actionable."

The case of Duane Jones Co., Inc. v. Burke, 306 N. Y. 172, 117 N. E. 2d 237, is analogous to the instant case. There the defendants, who except for one were former officers or employees of the plaintiff, agreed amongst themselves that they would take over the business of the plaintiff agency either by purchase of a controlling interest in the corporation or by resignation en masse and the formation of a new agency. When they were unsuccessful in purchasing, they resigned en masse, formed a new corporation, and attempted to service plaintiff's former accounts. The New York court upheld a jury verdict for plaintiff for $300,000. The answer to one of the defenses urged in that case is particularly pertinent herein. It was that the defendants did not avail themselves of the benefit of the customers and personnel diverted until after the defendants had received notice of discharge or had informed the plaintiff of their intention to leave. The court there held this was immaterial as the jury could have found the conspiracy originated while a fiduciary duty existed and the subsequent developments were merely the results of a predetermined course of action.

In the case of Hall v. Decker, 45 Cal. App. 2d 783, 115 P. 2d 15, Dekker, an officer and director of a corporation who had entered into a contract to sell his interest to the other stockholders, while still an officer and director, joined three other employees in organizing a competing company and, having obtained a list of the plaintiff's customers, solicited them and obtained orders. The California court, in affirming a judgment against all of the defendants, said: "It is the established law that a director or officer of a corporation may not enter into a competing enterprise which cripples or injures the business of the corporation of which he is an officer or di-

rector (Red Top Cab Co. v. Hanchett, 48 Fed. (2d) 236, 238; Hussong Dyeing Mach. Co. v. Morris, (N. J.), 89 Atl. 249, 250)."

Defendants' motion for judgment notwithstanding the verdict or for a new trial listed 31 alleged errors. The trial court overruled the motion for judgment notwithstanding the verdict but did sustain the motion to set aside and vacate the verdict and judgment, and granted a new trial. No reason was assigned by the court for its action.

The procedure in such situation is outlined in Greenberg v. Fireman's Fund Ins. Co., 150 Neb. 695, 35 N. W. 2d 772. We there provided: "If the trial court gave no reasons for its decision, then the appellant meets the duty placed upon him when he brings the record here with his assignments of error and submits the record to critical examination with the contention that there was no prejudicial error. The duty then rests upon the appellee to point out the prejudicial error that he contends exists in the record and which he contends justifies the decision of the trial court. The appellant then in reply has the right, if he desires, of meeting those contentions." To meet this burden, defendants urged 10 assignments of error. Having disposed of the motion for judgment notwithstanding the verdict, we consider herein the other assignments discussed in the defendants' brief.

Defendants urge that the trial court erred in permitting the plaintiff to prove the value of its alleged loss of good will by an offer of purchase made by the Continental Coffee Company. There is no merit to this contention.

With reference to the testimony as it appeared in the evidence of Bellows, the jury was properly admonished that the testimony as to the offer was not to be considered as an element of damages, and no further comment is necessary. Considering the evidence as it appeared in the testimony of Stanley Owens, financial

vice president of the Continental Coffee Company, a qualified expert, we do not interpret the testimony in the same light as the defendants. After qualifying the witness as an expert, he was asked: " 'Q. Now, Mr. Owens, based upon your experience over the years in the coffee business, and in the acquiring of other coffee companies such as Gibson Coffee Company, and your familiarity with the Gibson organization and operations as a result of the investigation that you testified that was made by your company of the Gibson operations, do you have an opinion as to the value of the good will of the Gibson Coffee Company, assuming the continuance of the then status quo of· the Gibson operations and sales force as it then existed? I am referring to the early stages of your negotiations.' * * * 'Q. Just yes or no, if you have an opinion. A. Yes, I think I could. Q. Would you state that opinion?' * * * 'A. I would like the record to show, first of all, that no two negotiations are exactly alike and that the valuation placed on the Gibson Coffee Company by myself and my associates would have no relevancy to other acquisitions. It was our opinion that if we were able to acquire the Gibson Coffee Company and their organization as it was during the negotiations, we would have been willing to pay a total of $30,000, which is five dollars a pound for the 6,000 pounds of weekly business as a good will figure.' " Read in context, we construe this testimony to be the opinion of the expert as to the value of the good will at the time in question.

The instructions of the court restricted plaintiff's damage to the dollar reduction in value, if any, proximately caused as set out in instruction No. 5, to its good will. Defendants urge that the jury verdict of $20,000 cannot be sustained because it is based entirely upon conjecture by the jury. Bellows valued the good will at $35,000. Plaintiff's expert fixed its value at $30,000. The tax records of the company carried a good will figure of $444.71. Defendants contend that any good will there

may have been was sold, or at most it could not exceed the $5,000 which Bellows wanted for an agreement not to compete. Defendants insist that the jury is limited solely to one of these four figures. We do not accept this premise. In any event, there were other indications of value in the evidence. Dave Clark testified Bellows had told them the book value of the equipment was $18,000. There was also testimony that the formula worked out by the Conroy company for the accounts receivable and the equipment came to $25,000. The total sales price, which included these items and the good will, was to be between 40 and 50 thousand dollars.

If we were to follow defendants' argument to its ultimate conclusion, we would require a much higher degree of certainty for damages than for other elements in the action. Juries are allowed to act upon inferential and probable as well as direct and positive proof. In Tarry v. Johnston, 114 Neb. 496, 208 N. W. 615, we said: "In an action at law for the loss of good will, the evidence must contain sufficient data to enable a jury, with a reasonable degree of certainty and exactness, to *estimate* the actual damages." (Emphasis supplied.)

In many types of tort actions it may be said to be impossible to determine damages with exactitude and precision. Here, good will was not susceptible of exact pecuniary measurement. All that was required was that it be proved that damage resulted, and that sufficient evidence be adduced to enable the jury to make the most intelligible and accurate estimate which the nature of the case will permit.

In Colvin v. Powell & Co., Inc., 163 Neb. 112, 77 N. W. 2d 900, we held: "Where it has been proved that damage has resulted and the only uncertainty is the exact amount, it is sufficient if the record shows data from which the extent of the injury can be ascertained with reasonable certainty."

As we interpret this record, the verdict is within the range of the evidence. The jury is not duty bound to

accept the testimony of any one witness in every particular. It is permitted to make its estimate of the damage sustained, based upon its conclusion from the testimony of all of the witnesses. As we view this record, we cannot say that it does not contain sufficient data to enable the jury to reach the verdict it did.

In Van Wye v. Wagner, 163 Neb. 205, 79 N. W. 2d 281, we said: "The question of the amount of damage is one solely for the jury and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of injury and damage proved."

Defendants attack the instructions of the court as misleading and confusing, and contend they are not sufficiently explicit to cover their theory of the case. The answers of the defendants were limited to general denials, and they did not tender any proposed instructions. Defendants specifically complain that the court did not give a specific instruction on malice or legal justification, and that for this reason the third paragraph of instruction No. 10 could only result in confusion. That paragraph is as follows: "What one employee may lawfully do may be done lawfully by several employees at the same time, so long, at least, as they act independently. But if their acts are done in concert, or all at the instance of a third party or parties, without just cause or for an unlawful or wrongful purpose, their acts become unlawful and constitute an actionable wrong." Defendants argue competition was a just cause and they were entitled to a specific instruction on that point. In this respect, conspiring with a fiduciary to violate his trust is not competition but an unfair competitive practice.

Defendants also complain of instruction No. 9 which defined coercion, fraud, misrepresentation, and unfair competitive practices. We find no error in the instruction, and the defendants have pointed out none except as they contend it to be inapplicable under their theory of the case. These terms are used in instruction No. 5

which covered the pleadings herein. There is evidence in the record from which the jury could find all of the elements present, as should be evident from what we have said heretofore.

Defendants insist that instruction No. 12 on fiduciary relationship is misleading. The instruction is as follows: "An officer or director of a corporation has a fiduciary relationship to the corporation and its stockholders. He must refrain from all acts inconsistent with his corporate duties. He is not necessarily precluded from entering into a separate business because it is in competition with the corporation; but if he does he must prove by a preponderance of the evidence that he did so in good faith and did not act in such a manner as to injury (sic) or damage or contribute to the injury or damage of the corporation, or deprive it of business, and if he fails in this burden of proof there is a breach of that fiduciary trust or relationship." The instruction is a correct statement of the law, and is not misleading under the issues herein. See Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393.

The instructions of the court must be considered in toto, and when so considered herein they cover the issues raised by the pleadings and supported by the evidence. If defendants wished more explicit instructions, it was their duty to tender proposed instructions. This they did not do. The applicable law in this connection is that set forth in Stahlhut v. County of Saline, 176 Neb. 189, 125 N. W. 2d 520. In that case, we said: "In Plumb v. Burnham, 151 Neb. 129, 36 N. W. 2d 612, this court said: 'It may be conceded that the instruction of itself was not sufficiently explicit, but defendants made no request for any instruction upon the issue. In that connection, the rule is that: " 'A party desiring a more explicit instruction than that given should offer such an instruction.' " * * * As held in Christensen v. Tate, 87 Neb. 848, 128 N. W. 622: "Instructions must be considered and construed together. If they are not

sufficiently specific in some respects, it is the duty of counsel to offer requests for instructions that will supply the omission. And, unless this is done, the judgment will not ordinarily be reversed for such defects." ' "

From what has been said, it follows that our previous opinion should be vacated; that there is no prejudicial error in the record; that the verdict is supported by the evidence; and, therefore, the order of the trial court sustaining the motion for a new trial was erroneous. The verdict against the defendants should be reinstated and judgment entered thereon.

FORMER OPINION VACATED. JUDGMENT REVERSED AND CAUSE REMANDED WITH DIRECTIONS TO REINSTATE THE VERDICT AND ENTER JUDGMENT THEREON.

WHITE, C. J., and BOSLAUGH, J., dissenting.

We respectfully dissent from that part of the majority opinion which holds that the evidence was sufficient to sustain a finding that previous to any offer of sale, Loseke and Conroy conspired and agreed to take over the Gibson business if Conroy could not force a sale on its own terms.