J. H. Williams & Co. v. Commissioner.
J. H. Williams & Co. v. Commissioner
Docket No. 6693.
United States Tax Court
1947 Tax Ct. Memo LEXIS 300; 6 T.C.M. (CCH) 163; T.C.M. (RIA) 47041; February 20, 1947
Daniel B. Priest, Esq., and Elmer K. Weppner, Esq., for the petitioner. Harold D. Thomas, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $25,545.91 in excess profits tax of the petitioner and a subsidiary company for the calendar year 1940. The Commissioner, in determining the consolidated invested capital, eliminated $1,053,957.50 with the explanation: It is held that you have not established, as a part of equity invested capital, any good will arising out of the acquisition during the year 1920 of a part of the assets of Whitman & Barnes Manufacturing Co. The only issue for decision is whether the respondent erred "in excluding goodwill of fair market value of $692,292.09 paid in for capital stock on April 3, 1920." *301 Findings of Fact The petitioner, a New York corporation, filed a consolidated excess profits tax return for the taxable year with the collector of internal revenue for the 28th district of New York. The petitioner at all times material hereto has been engaged in the business of manufacturing drop forgings and tools. Its business has been in continuous operation since 1882. It had plants at Brooklyn and Buffalo. The Whitman & Barnes Manufacturing Company (hereinafter referred to as W & B) had three plants in 1919. Its business had been in continuous operation since 1846. Its plants at Chicago and at St. Catharines, Ontario, were engaged principally (exclusively beginning late in 1919) in the manufacture of drop forgings and tools, which business constituted about 45 per cent of the total sales of the company in 1919. The third plant at Akron, Ohio, was engaged in a different business. The petitioner, W & B, and two other companies entered into discussions in 1919 in regard to consolidating their drop forging businesses. The discussions finally resulted in an agreement between the petitioner and W & B whereby the petitioner took over the drop forging and tool business of W *302 & B. The negotiations were conducted at arms' length. A preliminary contract, entered into on March 17, 1920, was changed somewhat by the final agreement dated June 18, 1920, under which W & B was to sell its physical assets, including land, buildings, equipment, materials, and all other assets used by it in its drop forging business in connection with its plants at Chicago and St. Catharines, but not including some accounts receivable of the Chicago plant and some Canadian bonds of the St. Catharines plant. Assets used in other parts of its business were excluded. The portion of the agreement describing the property being conveyed contained the following paragraphs: All patents, patent rights and goodwill owned by the W & B Company used in connection with the drop forging and drop forged tool business heretofore carried on by it at such plants and other lines at said plants taken over by the Williams Company, together with the exclusive right to use all trade marks and trade names of the W & B Company in connection with said drop forging and drop forged tool business and other business taken over by the Williams Company, heretofore used by the W & B Company, it being the intention *303 that the W & B Company shall retain the right to use such trade marks and trade names in connection with products other than drop forgings and drop forged tools and other business taken over by the Williams Company. * * * It is understood and agreed that the W & B Company is transferring to the Williams Company all of the patents, trade marks, trade names and goodwill of its drop forging and drop forged tool business and allied lines, and the W & B Company agrees with the Williams Company that for a period of twenty-five (25) years from and after the date hereof the W & B Company will not enter into, or be interested, directly or indirectly, in any other drop forging or drop forged tool or allied business, and the Williams Company agrees that for such period it will not enter into or be interested, directly or indirectly in the manufacture or sale of drills, reamers, taps, dies, milling cutters and allied lines. W & B made an "assignment" to the petitioner dated August 17, 1920 which contained the following: * * * The Whitman and Barnes Manufacturing Company has sold and transferred, and by these presents does sell, assign, transfer and set over unto said J. H. Williams & Co. *304 , its successors and assigns, the goodwill of said The Whitman and Barnes Manufacturing Company in connection with the drop-forging and drop-forged tool business heretofore conducted by said The Whitman and Barnes Manufacturing Company at plants at West Pullman, Chicago, Illinois, and St. Catharines, Ontario, Canada, and does hereby give, grant and set over to said J. H. Williams & Co. the exclusive right to use all trade marks and trade names of said The Whitman and Barnes Manufacturing Company heretofore used by it in connection with the drop-forging and drop-forged tool business and other business heretofore conducted by The Whitman and Barnes Manufacturing Company at said plants and taken over by J. H. Williams & Co., a list of the trade marks hereby covered is hereto attached and made a part hereof, it being understood, however, that said The Whitman and Barnes Manufacturing Company shall retain the right to use such trade marks and trade names in connection with products other than drop-forgings and drop-forged tools and other business taken over by said J. H. Williams & Co. Thirteen trade marks are listed in the assignment. W & B received, as consideration for the sale of *305 all assets transferred, $915,000 in cash (being the proceeds from the sale for the account of W & B of bonds of the petitioner in the principal amount of $1,000,000) and 50,700 shares out of a total issue of 195,000 shares of the capital stock of the petitioner. The number of shares of the petitioner's stock to be retained by it and the number to be transferred to W & B was based, in accordance with the agreement, upon an appraisal of the tangible assets of each company as of April 3, 1920. The price of steel and steel products began to increase in 1915 and continued an upward trend for several years due to World War I. Earnings of companies engaged in manufacturing steel and steel products increased rapidly during that period. The petitioner did not acquire any valuable intangible assets from W & B through the transactions which took place in the spring of 1920. Opinion MURDOCK, Judge: The definition of equity invested capital is contained in section 718, I.R.C. The computation includes property paid in for stock. Such property is to be included in an amount "equal to its basis (unadjusted) for determining loss upon sale or exchange." The issue as presented *306 by the pleadings is whether good will of W & B was paid in for capital stock of the petitioner in the spring of 1920 and, if so, the amount which should be included in equity invested capital. The petitioner recognizes that it must show, (a) that W & B possessed and used valuable intangible assets in connection with its drop forging business, and (b) that those intangible assets were transferred to the petitioner in exchange for its stock. It must also show the petitioner's "basis (unadjusted) for determining loss upon sale or exchange" of those assets. See Ralphs-Pugh Company, Inc., 7 T.C. 325. The petitioner contends that intangible assets of W & B having a value of at least $692,292.09 were transferred to the petitioner in the spring of 1920 in exchange for stock of the petitioner. The respondent contends that the petitioner did not acquire any valuable intangible assets from W & B. One of the arguments of the petitioner in support of its contention is that the earnings of W & B during the five years preceding 1920 from the use of the assets transferred to the petitioner were in excess of a reasonable return upon the investment of W & B in the tangible assets, and *307 the excess earnings, when capitalized according to a formula, show a large value for intangibles. The original records, from which the necessary figures might have been definitely proven, were not offered by the petitioner, apparently because they were unavailable. Some other evidence of the assets and earnings of W & B was introduced in evidence. The parties are not in agreement as to the figures to be used in the computation advocated by the petitioner. No exact findings have been made as to those figures because such findings would not change the result and because of the difficulty of making findings from the present record. Decision of the case will not turn upon the differences between the parties as to those figures. The petitioner can be given the benefit of every doubt without changing the result herein. The petitioner uses in its computation the estimated or approximated earnings of W & B from the use of the transferred assets during the five years preceding 1920. The respondent contends that the earnings for that period do not reflect normal earnings and are not a fair indication of the earnings which might have been expected by one looking ahead in the spring of 1920. *308 Cf. White & Wells Company v. Commissioner, 50 Fed. (2d) 120, reversing 19 B.T.A. 416; D.N. & E. Walter & Co., Inc., 10 B.T.A. 620. Mertens, Law of Federal Income Taxation, section 59.41. He argues that they reflect the unusual and abnormally large earnings of the period of World War I and, if those figures are properly discounted to eliminate the effect of the stimulus of war upon earnings, or if the earnings for a ten-year period prior to 1920 are taken (Cf. C. F. Hovey & Co., 4 B.T.A. 175, there will be no earnings in excess of a reasonable return upon the value of the tangible assets used during that period and, consequently, no indication of the existence of any valuable intangibles. The findings requested by the parties showing the net book values of tangible assets employed by Whitman & Barnes in its Chicago and St. Catharines plants differ materially. Also there is evidence that the actual value of those assets was much larger than their book values. However, it is safe to say from the record that the assets did not change much and their book values averaged a little over $1,800,000 from 1910 up to about 1916 after which *309 they ranged between about $2,000,000 and $2,700,000. The parties seem to disagree in only one particular in regard to the net profit or loss of W & B, after taxes, attributable to the Chicago and St. Catharines plants for the years 1910 through 1919. The following table shows the approximate figures and the one instance in which the parties disagree: Net profit or
Year
(loss) after taxes
1910
$ 57,329.59
1911
43,025.08
1912
42,894.21
1913
51,749.96
1914
(53,875.44)
1915
123,852.30
1916
338,741.44
1917
298,096.54
1918
347,843.83 *
1919
51,466.22
The above mentioned figures reflect a relatively small, but nevertheless substantial, amount of business different from the drop forge and tool business which should, if it could, be eliminated for present purposes. However, the parties seem to agree that the distortion does *310 not seriously affect the present problem. It is apparent from the figures in evidence that there was a large increase in the earnings of the Chicago and St. Catharines plants during the period of World War I out of all proportion to the increase in the assets used in those plants. There is other evidence to indicate that those increased earnings were due primarily to the stimulus of the war. The evidence supports the contention of the respondent that the earnings of the period 1915 to 1919, inclusive, were, to a considerable extent, the result of war stimulation and that they are not satisfactory for the purpose to which the petitioner would put them. The record does not show to what extent those figures should be discounted on account of the war. The earnings for the ten-year period show no excess over a reasonable return on the tangible assets apparently used in the business. Consideration of the evidence of earnings not only does not show the existence of valuable intangibles but, on the contrary, tends to show rather convincingly that the assets transferred by W & B did not include any valuable intangibles of any kind. The petitioner also relies upon the evidence of an expert *311 evaluator who testified that in his opinion intangibles of W & B having a value of about $750,000 were transferred to the petitioner. This witness was attempting to value the alleged intangibles after the lapse of many years. He relied in part upon the estimated or approximated earnings of W & B in using the transferred assets during the five-year period preceding 1920 which included the war period. He took a most optimistic view of the expected earnings of the petitioner after 1920 which never materialized. He used values as appraised by others. His testimony has been carefully considered. No effort is being made to discuss all of the evidence in this case. Suffice to say that all has been carefully considered and has been given such weight as it seems to merit. Due consideration has been given, for example, to the fact that no value was assigned to the intangibles in the negotiations, no stock was specifically issued for intangibles, and there is no showing that intangibles were carried on the records of either W & B or of the petitioner or the extent of their use. However, they were mentioned in the instruments executed in 1920 and there is some testimony that the negotiators *312 considered that the intangibles of the petitioner were to the tangibles of the petitioner as the intangibles of W & B were to its tangibles and, consequently, there was no occasion to consider the intangibles separately. The Court concludes in the light of all of the evidence that no intangibles of value were transferred by W & B to the petitioner in the transaction which took place in the spring of 1920. The determination of the Commissioner must be approved. No consideration has been given in the above discussion to the question of the petitioner's basis for determining loss upon the sale or exchange of any intangible assets which it acquired from W & B. The parties seem to agree that the basis to the petitioner for loss on any intangibles acquired in 1920 from W & B would be the cost of those intangibles to the petitioner. The property which W & B transferred to the petitioner in 1920 was not all paid in for stock. The petitioner also gave in exchange a million dollars face value of its own bonds. Property acquired for bonds is not a part of equity invested capital. If valuable intangible assets were transferred to the petitioner along with the tangibles, then the petitioner would *313 have to show how much of the intangibles was transferred for stock and how much may have been purchased with the bonds. This point has not received adequate attention from the petitioner. The cost of that part of the intangibles paid in for stock would be the value of the stock issued therefor. The value of the stock and the value of the intangibles paid in for stock would not necessarily be the same. The stock of the petitioner had behind it not only the assets acquired from W & B but also assets and liabilities of its own which it had prior to the transaction with W & B. This is not a case where the value of closely held stock exchanged for assets can be assumed to be the equivalent of the value of those particular assets. That reasoning applies in full force only where no other assets and liabilities are involved. An appraisal by the petitioner's expert witness was introduced in evidence in which he concluded that the value of the stock in the spring of 1920 was $70 a share. But there is some other evidence to indicate a smaller value. If intangibles of substantial value were transferred at that time, the petitioner would lose unless additional findings showing their cost in stock *314 could be made from the record. Decision will be entered for the respondent. Footnotes
*. The petitioner would increase this figure to $474,588.11 to restore to income $126,749.28 which it describes as "extraordinary depreciation deducted for that year," but the respondent argues that if depreciation was extraordinary due to heavy use during the war, it should serve to reduce the income realized from that use.↩