Estate of Kellar E. Watson, Sr., Deceased, Kellar E. Watson, Jr., Executor v. Commissioner.
Estate of Kellar E. Watson v. Commissioner
Docket No. 10406.
United States Tax Court
1948 Tax Ct. Memo LEXIS 251; 7 T.C.M. (CCH) 74; T.C.M. (RIA) 48019; February 18, 1948
*251 Joseph D. Brady, Esq., and Stanley C. Anderson, Esq., 433 So. Spring St., Los Angeles 13, Calif., for the petitioner. E. A. Tonjes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in estate tax of $ 3,154.74 against the estate of Kellar E. Watson, Sr., hereinafter referred to as decedent. The value of decedent's interest, at the time of his death, in a partnership business - a retail drug store - of which his son was the other partner, is the sole litigated issue. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Decedent died on November 7, 1943. Kellar E. Watson, Jr., his son, is the executor under decedent's last will and testament. On November 7, 1943, decedent and his son were, and had been since 1937, engaged as partners in the business of operating a retail drug store under the name "Watson's Drug Store," in the City of Orange, California, with a population of about 9,000. It was provided, inter alia, in the articles of partnership, dated July 1, 1937: "That at the termination of this partnership a full and accurate *252 inventory shall be prepared, and the assets, liabilities and income, both gross and net, shall be ascertained; that the debts of the partnership shall be discharged; and all moneys and other assets of the partnership, then remaining, shall be divided in specie, between the partners, share and share alike." The business had the Rexall agency for Orange and was operated at the best location in the city in a part of a building owned by decedent. The fair rental for the store for the period 1939 to 1943 was $ 150 per month. The partnership had no lease. The partnership was the successor of a sole proprietorship established by decedent in 1899 on South Glassell Street, Orange, California. In 1901 decedent moved his business to 118 East Chapman Avenue, and in 1926 he moved the business to 120 East Chapman Avenue, its location on November 7, 1943, and at present. The store has been known as Watson's Drug Store since 1899. The business has maintained a good reputation in the community. Decedent's son became connected with the store in June, 1928, as an employee of decedent. From 1928 to date he has been the active general manager of the store. From 1928 until sometime in 1936 decedent *253 consulted with him on the more important problems of management. During 1936 decedent suffered a severe nervous breakdown and thereafter took no part in the operation or management of the store. At all times since 1936 Kellar Watson, Jr., has assumed and discharged all of the functions of management pertaining to the store. He was a registered pharmacist since 1928. His civic activities and community prominence were instrumental in drawing customers to the store. Reasonable compensation for his services for the period 1939-1943 would average $ 4,500 per year. The balance sheet of the partnership as shown by its books at the close of business on November 7, 1943, was as follows: Cash on Hand
$ 2,022.83
Cash in Bank
15,363.50
Accounts Receivable
3,612.00
Merchandise Inventory
29,084.44
Fixtures Net
1,180.08
Investments
1,000.00
Government Bonds
3,900.00
Assets
$ 56,162.85
Accounts Payable
$ 6,210.20
Accrued Sales Tax
297.61
Accrued Excise Tax
62.05
Employee Bonds
48.00
Withholding Tax
120.95
Payroll Tax
79.42
Liabilities
$ 6,818.23
Net Worth
$49,344.62
Capital Account: K. E. Watson
$ 25,672.31
K. E. Watson, Jr.
$ 23,672.31
Except for *254 the item "Fixtures net * * * $1180.08," the balance sheet fairly and accurately reflects the fair market value of the partnership assets as assets of a going concern and the fair market value of the respective partner's interests therein at the date thereof, on a going concern basis, exclusive of good will. The sales, gross profit, and net profit of the partnership for the years 1930 to 1944 were as follows: Year
Sales
Gross Profit
Net Profit
1930
$ 39,990.57
$14,885.95
$ 2,446.59
1931
38,133.74
9,987.05
(3,305.62)
1932
28,623.06
8,767.29
(1,992.48)
Loss
1933
33,229.27
8,170.79
(2,431.28)
1934
37,297.60
9,867.98
2,066.31
1935
44,005.42
12,747.96
2,885.75
1936
49,328.10
15,851.56
5,986.74
1937
61,601.64
18,451.95
6,641.86
1938
66,500.71
20,520.96
6,882.28
1939
62,989.71
19,592.69
4,882.26
1940
69,364.23
22,172.16
7,137.80
1941
74,661.95
23,853.26
8,234.66
1942
99,864.74 [1]
35,435.92
16,841.28
1943
115,472.42 [2]
58,758.72
38,761.22
1944
137,521.30 [3]
55,964.88
31,652.31
*255 The net profits for the years 1939 to 1943 shown are after deduction of rent of $ 100 per month and compensation paid to decedent's son, which averaged $ 2,825 per year. Decedent was paid no compensation. The sales, gross profit, and net profit of the partnership for 1943 through November 7, exclusive of miscellaneous revenue of $6,225.47, were as follows: Sales
$ 91,316.67
Gross Profit
47,372.45
Net Profit
30,819.52
During the years 1939-1944, inclusive, the business had miscellaneous revenues in the total amounts and from the sources as follows: Total
Punchboards
Brunswig Drug
Other
1939
$ 330.85
$ 330.85
1940
1,813.18
$ 1,606.21
206.97
1941
3,394.08 * $1,623.25
1,177.29
593.54
1942
7,264.17
4,882.59
1,477.78
903.80
1943 to 11/7
6,382.44
4,433.37
1,234.87
714.20
11/7 to 12/31
1,112.18
669.10
350.74
92.34
1944
5,906.49
2,749.80
1,603.03
1,553.66
* Punchboard business started April, 1941, and ended July, 1944. The miscellaneous revenues shown above under the caption "Brunswig Drug" represented a quantity discount on merchandise bought for resale from the Brunswig Drug Company, a large Los Angeles wholesale drug company. The miscellaneous revenues shown above under the caption "Other" consisted of revenue from the public telephones in the store, discount on quantities of ice cream sold, and payments made for counter and window displays on behalf of various manufacturers of cosmetics and pharmaceutical products. The punchboards were operated in violation of a city ordinance of the City of Orange, California. While there had been periodic objections of a reformer group at various times, the activity to enforce the prohibition of punchboard operation was no greater in 1943 than in prior years and no particular circumstance was present at or about November 7, 1943, which would indicate that the enforcement of the prohibition would be effected in the near future. During the first four months of 1942 there were stationed in the community about 1,500 army men, as a result of which the partnership's business was increased. Total sales for the period aggregated $36,048.71. For the same period in 1941 sales had been $22,128.12, and for the first four months of 1943, were about $33,000. For state inheritance tax purposes, decedent's son valued the store fixtures at $11,180. This figure included an element designed to reflect the good will of the partnership. The fixtures, consisting of shelving, show cases, soda fountain, and cash registers, had a replacement value at the time of decedent's death of $8,000. In his will decedent provided: "It is understood that Kellar E. Watson, Jr. is operating a drug store under a contract with this testator. I direct that Kellar E. Watson, Jr. be allowed to continue the operation of said drug store under the terms of said contract, and that he be entitled to any credits which have accrued to him under the terms of said contract, and that he be allowed the same salary and privileges in said drug store as agreed upon between the testator and him prior to the death of said testator, it being understood that accurate books of account shall be kept showing the status of the said Kellar E. Watson, Jr. from time to time in connection with said drug store. * * *
"It is my wish, and I direct, that my said Executors keep and manage the property of my said estate until in the discretion of Kellar E. Watson, Jr., if he be alive, or if he be dead, then in the discretion of said The First National Bank of Orange, a sale of said property can advantageously be made. When in the discretion of my said Executors, as above set out, a sale of a portion of said property can advantageously be made, then I direct that said Executors cause said property to be sold until sufficient of said property is sold to equal the share of said estate to which Janet C. Watson is entitled, after deductions for any advancements made to the said Janet C. Watson. After said portion of said estate has been sold and reduced to cash, I direct that my estate then be closed and that the portion of my said estate to which Janet C. Watson is entitled be distributed in cash and the remaining portion be distributed to Kellar E. Watson, Jr., either in cash or in property." The portion left to his daughter, Janet C. Watson, was in trust, with instruction to the trustees to purchase annuities for her. An action was instituted to terminate the testamentary trust which would have required the liquidation of one-half of the estate to provide the annuities set forth in the will. A decree was obtained permitting the executor not to liquidate the estate and to distribute one-half of the estate to Janet Watson in the form of estate property, including a share in the drug store business. Subsequently a decree was entered providing for the distribution of a substantial amount of the estate, one-half being set up in trust for Janet Watson. An order of the State Court was also obtained permitting Kellar Watson, Jr., as trustee, to continue the drug store business. Liquidation of the business was then unnecessary, Kellar Watson, Jr., being permitted to carry on the business as trustee and partner. Respondent determined that the value of the good will of the partnership at the time of decedent's death was $28,826.73. He adopted as net earnings for the five-year period 1939-1943 the sum of $56,357.89, after deducting from earnings income tax of $11,557.63. The fair market value of the good will of the partnership at the time of decedent's death was $ 3,000, and the fair market value of the fixtures was $8,000, the interest of decedent's estate in each being one-half. Opinion The principal dispute as to the existence and value of partnership good will has been disposed of by our finding of fact. The possibility of the existence of good will under these circumstances seems established by Estate of Leopold Kaffie, 44 B.T.A. 843, 847: "* * * The location of the business and the name under which it was conducted might give the property to be valued a fair market value in excess of the cost or book value of the assets. * * * "We apprehend that the same rule would apply in the case of the death of a partner in a profitable business. * * *" There seems little question that the pharmacy in which decedent owned his partnership interest was, particularly in the war years, a profitable business. It was, moreover, a retail establishment with a potential customer clientele and none of the considerations eliminating the existence of any valuable good will in the Kaffie case can be said to be completely operative here. In arriving at a disposition of the factual issue as to whether the good will had a value and, if so, its extent, we have proceeded generally upon the principles set forth in A.R.M. 34, 2 C.B. 31, 32, particularly the portion reading as follows: "The third method and possibly the one which will most frequently have to be applied * * * is to allow out of average earnings over a period of years * * * preferably not less than five years, a return of 10 percent upon the average tangible assets for the period. The surplus earnings * * * should be capitalized upon the basis of not more than five years' purchase - that is to say, five times the amount available as return from intangibles should be the value of the intangibles." Certain adjustments need to be made in the net income of the business for inadequate rent and salaries on the one hand, and, on the other, for at least a portion of what was evidently extraordinary business that could not be relied upon as a permanent source of revenue. Even after that is done, however, it becomes apparent that the selection of the five-year period prior to decedent's death includes a disproportionate number of prosperous years. From the context of A.R.M. 34, [2 CB 31] set forth above, from the comment of textwriters, e.g., 10 Mertens, Law of Federal Income Taxation, 526, and from the cases, [1] it is evident that there is nothing sacred about the selection of a five-year period. Since the material appears in the record, we have accordingly adopted as the scale of prospective average earnings of this business the ten years from November 7, 1933, to November 7, 1943. This period, in our judgment, includes a sufficient number of bad years to strike an adequate balance with the later period of good business. *256 A.R.M. 34, [2 CB 31] it is true, refers to an adjustment to the respective figures of 8 and 15 percent for the return on tangibles and intangibles in connection with "a business which consists of the * * * sale of standard articles of everyday necessity not subject to violent fluctuations and where the hazard is not so great," but we have selected the higher figures, in view of the inescapable risks surrounding the business involved here. Absence of a long-term lease, of a contract of employment with the mainspring of the business and of the possibility of competition from that source, we think adequately compensated for by use of these higher percentages. We have accordingly found as a fact the value of the good will which, in our view, a willing buyer would pay for the property. A similar conclusion accounts for our finding as to the fair market value of the fixtures. Decision will be entered under Rule 50. Footnotes
1. Exclusive of miscellaneous revenue of $ 7,264.17. ↩
2. Exclusive of miscellaneous revenue of $ 7,494.62. ↩
3. Exclusive of miscellaneous revenue of $ 5,906.49.↩
1. E.g., C. F. Hovey Co., 4 B.T.A. 175; D. N. & E. Walter & Co., Inc., et al., 10 B.T.A. 620; House & Hermann, 13 B.T.A. 621, affirmed (C.C.A., 4th Cir.), 36 Fed. (2d) 51↩.